1  **BATHAEE DUNNE LLP**
   Yavar Bathaee (CA 282388)
2  yavar@bathaeedunne.com
   Andrew C. Wolinsky (CA 345965)
3  awolinsky@bathaeedunne.com
4  445 Park Avenue, 9th Floor
   New York, NY 10022
5  (332) 322-8835

6  Brian J. Dunne (CA 275689)
   bdunne@bathaeedunne.com
7  Edward M. Grauman (*pro hac vice*)
   egrauman@bathaeedunne.com
8  900 South MoPac Expressway
9  Barton Oaks Plaza I, Suite 300
   Austin, TX 78746
10 (213) 462-2772

11 *Attorneys for Plaintiffs and the Proposed Class*

12                    UNITED STATES DISTRICT COURT
13                   NORTHERN DISTRICT OF CALIFORNIA
                            OAKLAND DIVISION
14

15 | DARQUES SMITH, et al., | Case No. 4:23-cv-05761-HSG |
|---|---|
16 | Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANT INTEL CORPORATION'S MOTION FOR PROTECTIVE ORDER STAYING DISCOVERY** |
17 | | |
18 | v. | |
19 | | Hon. Haywood S. Gilliam, Jr. |
20 | INTEL CORPORATION, | Hearing Date: May 2, 2024 |
21 | Defendant. | Time: 2:00 p.m.<br>Courtroom 2, 4th Floor |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................................. 1

BACKGROUND .................................................................................................................................... 3

ARGUMENT .......................................................................................................................................... 5

    A.    INTEL'S MOTION TO DISMISS IS NOT LIKELY TO DISPOSE OF THIS CASE ........................................................................................................................... 7

    B.    INTEL'S MOTION TO DISMISS CANNOT BE GRANTED WITHOUT DISCOVERY ................................................................................................................ 12

CONCLUSION ..................................................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*California Crane School, Inc. v. Google LLC*,
   2022 WL 1271010 (N.D. Cal. Apr. 28, 2022) .................................................................. 5-6

*Gray v. First Winthrop Corp.*,
   133 F.R.D. 39 (N.D. Cal. 1990) ........................................................................................ 6

*Hodson v. Mars, Inc.*,
   891 F.3d 857 (9th Cir. 2018) ........................................................................................... 10

*In re Intel Corp. CPU Marketing, Sales Practices and Products Liability Litig.*,
   2023 WL 7211394 (9th Cir. Nov. 2, 2023) ................................................... 7, 10, 11, 12

*Limandri v. Judkins*,
   52 Cal. App. 4th 326 (1997) ........................................................................................... 10

*Little v. City of Seattle*,
   863 F.2d 681 (9th Cir. 1988) ............................................................................................ 6

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*,
   2018 WL 1569811 (N.D. Cal. Feb. 16, 2018) ............................................................... 6, 7

*Palantir Techs., Inc. v. Abramowitz*,
   2020 WL 13548687 (N.D. Cal. Jan. 30, 2020) .............................................................. 6, 7

*Serenium v. Zhou*,
   2021 WL 7541379 (N.D. Cal. Feb. 11, 2021) .................................................................. 6

*Wenger v. Monroe*,
   282 F.3d 1068 (9th Cir. 2002) .......................................................................................... 6

*Yamasaki v. Zicam LLC*,
   2021 WL 3675214 (N.D. Cal. Aug. 19, 2021) ............................................... 1, 6-7, 9, 10

**PRELIMINARY STATEMENT**

Defendant, Intel moves this Court to stay discovery pending its motion to dismiss based on a demonstrably false premise—that this case is simply a rehash of the Spectre and Meltdown litigation and that dismissal here is a *fait accompli*. As explained below, the facts alleged here are materially different, and the allegations suffer from none of the pleading deficiencies identified by courts in the Spectre and Meltdown litigation.

\*   \*   \*

This is a putative class action brought by consumers who bought Intel CPUs, or computers containing Intel CPUs, with a serious design defect. This defect, which Intel has known about since at least 2018, leaves certain Intel CPUs open to devastating attacks in which remote users can, among other things, steal AES encryption keys—the foundation for secure network connections (including HTTPS connections to e-commerce, banking, and health care websites) and data-at-rest encryption. Contrary to the statements of Intel's lawyers, this defect is not a "theoretical hacking technique," but has actually been deployed to steal AES keys and other sensitive information from secret buffers that (for reasons unexplained) Intel designed into generations of its chips, thereby compounding their vulnerability to so-called speculative execution attacks. The extent of such attacks in the wild, and their impacts on American consumers, is to date uncertain, because despite being sued over a serious speculative execution vulnerability six years ago, "no document productions or disclosures were exchanged, no written discovery was produced, and no depositions were taken." Mot. at 4. Instead, when Intel was sued six years ago over so-called "Spectre" and "Meltdown" vulnerabilities in its CPUs, the case against it was dismissed for the company's lack of knowledge, for a lack of any demonstrable hack based on the vulnerabilities, and for a variety of pleading deficiencies, including regarding the plaintiffs' failure to allege a defect that went to the central function of the affected CPUs.

Since the Spectre and Meltdown lawsuits, Intel publicly claimed it redesigned all its hardware to reduce its susceptibility to the class of attacks—so-called "speculative execution" attacks—that characterized Spectre and Meltdown. However, events in the past year have revealed that this was not the case. Far from redesigning its CPUs to avoid speculative execution attacks,

Intel built *secret buffers* in locations *it knew to be vulnerable to such attacks*—knew indisputably, because there is a public record of Intel being told in 2018 of such a vulnerability. Perhaps unsurprisingly, in 2022 a Google engineer was able to exploit Intel's vulnerable chips using a speculative execution attack called "Downfall." This engineer was able to remotely steal AES keys, among other serious incursions into the innermost sanctum of computers built around Intel CPUs. The engineer disclosed to Intel his attack vector into its CPUs, and explained that such attacks were not just devastating, but nearly impossible to detect. Ultimately, Intel's response to being told of a fully-developed attack that exploits its defective CPU design to steal AES keys and other information from secret buffers was to push a firmware patch that slows execution of affected Intel CPUs by up to **50%** during ordinary computing tasks like photo and video editing, gaming, and encryption.

Plaintiffs have been impacted by Intel's design defect, which leaves their computers vulnerable to attack and, once patched, slows them down by up to 50%. It is at this point unknown how many hundreds or thousands (or more) computers built around Intel CPUs have been or continue to be hacked using the vulnerability now publicly known as Downfall—but the entity best suited to tell Plaintiffs and the Court the extent of it is Intel, which unsurprisingly is seeking to provide no discovery in this action during motion to dismiss practice.

The problem for Intel, however, is that legally its dismissal arguments are nowhere near the sure thing it proclaims in its motion for a protective order. Unlike in the Spectre and Meltdown litigation, the Class Action Complaint ("CAC") here alleges that exploitation of the Intel's defective CPUs is highly practical and difficult to detect. Moreover, unlike in the Spectre and Meltdown litigation where the Ninth Circuit recognized there were "no allegations" that the defect impaired the central functionality of the CPU, the CAC alleges that central processing functionality of affected CPUs is crippled by Intel's design defect—Including the function of the CPU systems that control how the CPU processes instructions and in what order; the movement of large amounts of data to and from memory; the safety and processing of encryption keys used for virtually every secure process and application; the function of internal CPU cache memory; and the function of memory buffers and critical instructions hardwired in Intel's CPUs. And, unlike in the Spectre and

1  Meltdown litigation, plaintiffs here plead that Intel's supposed fix, which essentially disables central
2  CPU functionality to prevent the exploitation of its defective design, results in a performance
3  degradation that outweighs the harm from the defect itself. Finally, Intel has nothing at all to say
4  about claims asserted under Oregon, Illinois, Michigan, and Kansas law, nor does it address that the
5  Ninth Circuit's recent decision in the Spectre and Meltdown litigation addressed only California law
6  for its affirmance of the Court below. Intel has not shown that any of these other state law claims
7  are likely to be dismissed.

8  Because Intel is unlikely to dismiss this entire case based on its pending Rule 12 motion, and
9  because certain of Intel's arguments—including its lawyers' repeated factual assertions that this
10 case is built around a "theoretical hacking technique"—the Court should deny Intel's motion to stay
11 discovery.

## BACKGROUND

13 Modern CPUs have two core functionalities that are at issue in this action: "speculative
14 execution," which allows CPUs to execute instructions out of order and even to predict the outcome
15 of future instructions, Dkt. 1, Class Action Complaint (CAC) ¶¶ 75-88, and "segmentation,"
16 meaning that privileged computer programs and their resources are segregated from programs run
17 by users, *id.* ¶ 59-74. In the modern era, speculative execution is required for sufficient, expected
18 CPU performance in ordinary computing tasks. *Id.* ¶¶ 75-88, 182-220.

19 As alleged in the CAC, Intel defectively designed these core functions in its CPUs. When
20 Intel's CPUs speculatively execute instructions, they are supposed to discard the results of an
21 execution if the CPU guessed the instruction wrong. *Id.* ¶¶ 75-88. Instead, Intel's CPUs leave "side
22 effects," or data remains in temporary buffers or in the CPU's cache memory, even after the
23 speculative execution's results are discarded. *Id.* ¶¶ 89-96. Intel's CPUs also violate segmentation
24 by allowing speculatively executed code to see system resources and information that only an
25 operating system or privileged computer programs should be able to see. *Id.*

In January 2018, it was publicly revealed that Intel's CPUs suffered from vulnerabilities known as Spectre and Meltdown. CAC ¶ 97. These were attack vectors in Intel CPUs[1] that relied on speculative execution, an important functionality of modern microprocessors. *Id.* ¶¶ 96-111. In response to the public disclosure of the Spectre and Meltdown vulnerabilities, Intel promised a hardware fix for future generations of its CPUs. *Id.* ¶¶ 126-27. Around the time Intel was making these promises, in the summer of 2018, Intel received two separate vulnerability reports from third parties indicating that a set of instructions on Intel's CPUs, called the Advanced Vector Extensions ("AVX") instructions, was vulnerable to speculative execution attacks. *Id.* ¶¶ 130-52. Intel's AVX instructions perform critical CPU functions associated with encryption, media, gaming, and the execution of memory-optimized computer programs. Intel acknowledged both reports. *Id.* ¶¶ 131-33.

Despite this knowledge, and its promise to redesign its CPUs to mitigate speculative execution vulnerabilities, Intel did nothing. CAC ¶¶ 129, 149-54. It did not fix its then-current chips, and over three successive generations of CPUs, Intel did not redesign its CPUs to ensure that AVX instructions would operate securely when the CPU speculatively executed them. *Id.* ¶¶ 154-81. Instead, Intel implemented secret buffers associated with the AVX instructions and failed to disclose them to anyone. *Id.* ¶¶ 159-65. These secret buffers, coupled with side effects left in CPU cache, opened what was tantamount to a back door in Intel's CPUs. *Id.* ¶¶ 158-73. This back door would allow an attacker to use AVX instructions to easily obtain sensitive information—including AES encryption keys, the foundation of modern secure networking, secure communications, and secure data storage—from memory by exploiting the design flaw that Intel had told consumers it had fixed after Spectre and Meltdown. *Id.* ¶¶ 154-81.

Intel knowingly sold these defective CPUs for years. CAC ¶¶ 179-81. Then in 2022, a Google engineer discovered the defect with the AVX instructions and reported to Intel that its CPUs,

---

[1] Other types of processors, including AMD and some ARM-based processors, were vulnerable to the speculative execution vulnerabilities referred to as Spectre and Meltdown. Intel was, as far as Plaintiffs can tell, the only major chipmaker that failed to fix its chips' vulnerability to speculative execution attacks like Downfall, *see, e.g.,* CAC ¶ 171 ("AMD CPUs do not appear vulnerable to Downfall attacks")—despite telling consumers and the public otherwise, *id.* ¶ 126.

particularly its 6th through 11th generation CPUs, were vulnerable to speculative execution attacks—the same sort of attacks that gave rise to Spectre and Meltdown years earlier, which Intel had promised to fix. *Id.* ¶¶ 154-81. Rather than mitigating the damage to consumers, Intel asked the engineer not to publish the results. *Id.* ¶ 155.

Approximately a year after Intel was informed of the AVX vulnerability, the Google engineer published an academic paper and website disclosing Intel's secret AVX buffers and its CPUs' continuing vulnerability to the same category of attacks as Spectre and Meltdown, which the Google engineer called "Downfall." CAC ¶ 156, 158. Even though Intel had told customers that it engineered a hardware fix for the design flaw that gave rise to Spectre and Meltdown vulnerabilities since the release of its 9th generation CPUs, in reality all of Intel's 9th generation CPUs (and later) incorporated this flaw. *Id.* ¶¶ 161-81. Indeed, since 2018, before many of these supposedly fixed CPUs were released, Intel knew its AVX instructions were at risk from the same class of attacks as Spectre and Meltdown. *Id.* ¶¶ 130-53.

When this became public, Intel issued a microcode update, which was said by Intel to mitigate the Downfall vulnerability. CAC ¶¶ 182-95. The flaw in Intel's "mitigation," however, was that it handicapped the speculative execution and branch prediction functionality that is central to the function of every modern CPU, resulting in as much as a 50% performance degradation in affected CPUs. *Id.* ¶¶ 182-220. Plaintiffs are left with defective CPUs, or computers incorporating them, that must be severely impaired in performance and functionality to "mitigate" their vulnerability to Downfall. These are not the products they purchased. CAC ¶¶ 221-49.

On November 8, 2023, Plaintiffs filed this action, seeking relief for themselves and putative classes of Intel CPU or Intel-based computer purchasers. On January 25, 2023, Intel moved to dismiss. On January 26, 2023, Intel filed this motion.

**ARGUMENT**

"The Federal Rules of Civil Procedure do not provide for an automatic stay of discovery just because a potentially dispositive motion is pending." *California Crane School*, 2022 WL 1271010, at *1; *see also, e.g.*, *Yamasaki v. Zicam LLC*, 2021 WL 3675214, at *1 (N.D. Cal. Aug. 19, 2021) (same); *Serenium v. Zhou*, No. 20-cv-02132-BLF (NC), 2021 WL 7541379 (N.D. Cal. Feb. 11,

2021) (same); *Palantir Techs., Inc. v. Abramowitz*, No. 19-cv-06879-BLF, 2020 WL 13548687, at *1 (N.D. Cal. Jan. 30, 2020) (same). A district court has "'wide discretion in controlling discovery,' and that discretion extends to staying discovery upon a showing of 'good cause.'" *Palantir Techs.*, 2020 WL 13548687, at *1 (quoting *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988), and FED. R. CIV. P. 26(c)(1)(A)). "Good cause for staying discovery may exist when the district court is 'convinced that the plaintiff will be unable to state a claim for relief,'" *Palantir Techs.*, 2020 WL 13548687, at *1 (quoting *Wenger v. Monroe*, 282 F.3d 1068, 1077 (9th Cir. 2002)) (cleaned up), and under Ninth Circuit law, the party seeking to stay discovery carries the burden of showing this:

> Under Ninth Circuit law, "[a] party seeking a stay of discovery carries the heavy burden of making a 'strong showing' why discovery should be denied."

*Palantir Techs.*, 2020 WL 13548687, at *1 (quoting *Gray v. First Winthrop Corp.*, 133 F.R.D. 39, 40 (N.D. Cal. 1990); *see also Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 5:16-cv-06370-EJD, 2018 WL 1569811, at *1 (N.D. Cal. Feb. 16, 2018) ("the moving party must show a particular and specific need for the protective order" staying discovery). Intel has not carried this burden here.

"A district court may . . . stay discovery when it is convinced that the plaintiff will be unable to state a claim for relief." *Optronic Techs.*, 2018 WL 1569811, at *1. "In the absence of a specific test from the Ninth Circuit, district courts generally consider two factors to determine the appropriateness of a discovery stay: (1) whether the pending motion is potentially dispositive of the entire case, and (2) whether the pending motion can be decided without additional discovery." *Id.* (citation omitted). "A protective order may issue ***if the moving party satisfies both prongs***." *Id.* (quotation marks omitted and emphasis added). Intel's motion satisfies neither.

As Judge Davila explained in *Optronic Techs.*, a case in which the court declined to grant a motion to stay discovery in an antitrust case:

> Discovery stays are not automatic . . . and the two-factor test is not satisfied by superficial statements or vague articulations demonstrating nothing more than the traditional burdens of litigation. Rather, the moving party must show a particular and specific need for the protective order, as opposed to making stereotyped or conclusory statements. This requirement accounts for the fact that blanket stays of all discovery matters are an exception to the rules rather than enunciated in the rules.

2018 WL 1569811, at *1 (cleaned up). Judge Freeman is in accord. *See Palantir Techs.*, 2020 WL 13548687, at *3 (denying motion to stay discovery in RICO and trade secrets action where "Defendants offer no particular or specific facts to support [their] assertion that a stay would be necessary to spare the parties or the Court from the 'burden' of discovery," and quoting *Optronic Techs.* on that issue).

Here, Intel's arguments for dismissal are based on the false premise that this case is materially the same as the Spectre and Meltdown litigation, and are not likely to result in the dismissal of this entire action, failing prong 1. Additionally, Intel's repeated argument that this case is about a "theoretical hacking technique" (*see, e.g.,* Mot. at 1) rather than real-world, actually-experienced cyberattacks and performance degradations, is falsifiable through discovery—failing prong 2 as well.

### A.   Intel's Motion to Dismiss Is Not Likely To Dispose of This Case

Intel's argument for a stay begins from a demonstrably false premise: that this case is "materially identical" to claims brought unsuccessfully pleaded in the Spectre and Meltdown litigation. Mot. at 7. Not so.

Plaintiffs have not yet filed their opposition to Intel's Motion to Dismiss and intend to fully respond to all of Intel's arguments, but for the purposes of this brief, Plaintiffs address the central arguments raised by Intel in its dismissal motion. The facts here are starkly different than those at issue in the Spectre and Meltdown litigation—and those differences matter. Indeed, a comparison of the allegations here to the pleading deficiencies identified by the Ninth Circuit in *In re Intel Corp. CPU Marketing, Sales Practices and Products Liability Litig.* ("*In re Intel CPU Litig.*"), 2023 WL 7211394 (9th Cir. Nov. 2, 2023), makes clear that the pleadings here are sufficient to state the asserted claims.

**No "Actual Hack."** The very first sentence of Intel's motion asserts that this suit concerns a "theoretical hacking technique," Mot. at 2, and throughout its motion Intel blithely asserts that no one has been hacked because of its defective product, *id.* Intel is wrong.

Intel's CPUs are defectively designed at the hardware level, particularly in the most vital part of the CPU's mechanisms for executing instructions. CAC ¶¶ 59-111. This hardware flaw

allows hackers direct access to AES encryption keys, which are used for virtually every Internet application that uses encryption. *See id.* ¶¶ 10, 149, 158, 195. There is nothing "theoretical" about the vulnerability resulting from Intel's defective design. As the CAC alleges, Daniel Moghimi, the Google security engineer that discovered and reported the defect to Intel, created several exploits over two weeks—all of which he posted on his website (with videos demonstrating them). CAC ¶ 158. One of these exploits allows an attacker to extract AES encryption keys directly from a vulnerable CPU. *Id.* Moghimi was clear in an FAQ on his site devoted to Downfall that exploiting the defect was highly practical—the very opposite of "theoretical":

> [Q] How practical are these attacks?
>
> [A] GDS is **highly practical**. It took me 2 weeks to develop an end-to-end attack stealing encryption keys from OpenSSL. It only requires the attacker and victim to share the same physical processor core, which frequently happens on modern-day computers, implementing preemptive multitasking and simultaneous multithreading.

*Id.* ¶ 172 (emphasis added). Given the practicality of implementing a hack exploiting Intel's defective design, there are likely hundreds, if not thousands, of ready-made exploits of Intel's defective design. Moreover, if a person is hacked using a speculative execution attack, there is in most cases no way of detecting it—certainly for the typical, non-technical user. *See id.* ¶ 104.

It strains credulity that an easily exploited flaw in tens of millions of unmitigated CPUs, including in CPUs used in sensitive applications, *see, e.g.*, CAC ¶ 11, is not routinely being exploited on a daily, if not hourly basis, without detection. Indeed, the AVX instructions at issue here store secret encryption keys used by countless users of Intel's CPUs—a highly valuable target for hackers. *See id.* ¶ 10 (defect allows "an attacker to use AVX instructions to easily obtain sensitive information from memory—including encryption keys used for Advanced Encryption Standard ('AES') encryption—by exploiting the very design flaw that Intel had supposedly fixed after Spectre and Meltdown."); *see also id.* ¶¶ 149, 158, 195. Intel itself likely recognizes this: that's why it released a patch for its affected CPUs that slows them down as much as 50% in everyday tasks like video and photo editing, gaming and encryption. *Id.* ¶¶ 182-220. A chipmaker does not kneecap the

performance of entire generations of its highest-end CPUs for an academic exercise. The arguments put forth by Intel in its early motions do not make sense.

Intel's conceit that it has never been subject to discovery in any previous litigation regarding its flawed speculative execution design, *see* Mot. at 4, underscores why exploits of the flaw in Intel's CPUs are difficult to detect—and why discovery should not be stayed here. As Intel states in its Motion, "[o]ver the four years that the *Intel* [Spectre and Meltdown] MDL was pending, no document productions or disclosures were exchanged, no written discovery was produced, and no depositions were taken." *Id*. Reports of routine and numerous "hacks" that exploit Intel's defective CPUs are likely fixtures throughout Intel's files, but as Intel boasts in its Motion, any reports of incidents or exploits to Intel have not seen the light of day.

***Knowledge.*** In the Spectre and Meltdown litigation, Intel did not have knowledge of the defect in its branch prediction and speculative execution systems until the two exploits were discovered. *See In re Intel CPU Litig.*, 2023 WL 7211394, at *2. Here, Plaintiffs allege that Intel was directly warned about speculative execution flaws relating to the AVX instruction set, which the Downfall attack exploits. CAC ¶¶ 9, 135-44, 145-48. Indeed, as Intel publicly purported to have fixed and redesigned its chips in response to Spectre and Meltdown, Intel received and acknowledged two separate reports about speculative execution flaws in its AVX instruction set. *Id.* As Intel was addressing Spectre and Meltdown, it supposedly mitigated flaws in instruction buffers and CPU cache systems, but refused to make any changes to its design of the AVX instruction set—which is used to apply encryption for virtually every common application, *see id.* ¶¶ 10, 149, 158, 195. Worse, Intel had implemented ***secret buffers*** in its AVX instructions that were ultimately exploited in Downfall. *Id.* ¶¶ 10, 12, 160. Put simply, Intel knowingly left a wide backdoor to some of the most vital parts of CPU functionality and sensitive internal CPU memory. *See id.* Intel's presale knowledge of the defective design is both expressly pleaded with particularity and plainly

asymmetric—Intel knew about its secret buffers that were prone to speculative execution flaws; plaintiffs and other purchasers did not (and could not).[2]

**Central Function.** As the Ninth Circuit recognized, omissions-based claims, whether brought as fraud or unfair competition claims, must meet the following test for defendant to be charged with a duty to disclose: plaintiff must plead that "(1) the omission is material, (2) 'the defect was central to the product's function,' and (3) one of four factors discussed in *LiMandri v. Judkins*, 60 Cal. Rptr. 2d 539 (Ct. App. 1997), is present." *In re Intel CPU Litig.*, 2023 WL 7211394, at *1 (cleaned up and citing *Hodson v. Mars, Inc.*, 891 F.3d 857, 861 (9th Cir. 2018)). As the Ninth Circuit explained, in the Spectre and Meltdown litigation, there was "***no allegation*** that Plaintiffs' processors ever stopped operating as 'the brains of the computing device[s], performing all necessary computations for each application . . . and each peripheral.'" *Id.* at *1 (emphasis added and cleaned up).

Here, however, the CAC directly alleges that the speculative execution systems that are defective in Intel's CPUs impair the central function of affected Intel CPUs. CAC ¶¶ 192-220. As the CAC explains, Intel's speculative execution systems are defectively designed and the mitigations for Downfall essentially disable vital functionality that is required for a saleable, modern processor. Indeed, the defective systems include the CPU's cache memory, *id.* ¶¶ 7, 10, 72-73, 85, 88, 90, 93, AVX vector instruction set (which is used to store and process encryption keys used in virtually every modern computer application), *id.* ¶¶ 154-81, and the CPU's segmentation functionality, which prevents non-privileged computer programs from accessing sensitive computer resources and memory, *id.* ¶¶ 6, 7, 94, 165, 179; *see also* ¶¶ 59-74. Together, these effects of Intel's defective design prevent its CPUs from "performing all necessary computations for each

---

[2] In an effort to pretend that this case is a rehash of the Spectre and Meltdown litigation, Intel falsely states in its motion that the defect "was widely known before Plaintiffs purchased their devices." Mot. at 7. It was not. The vulnerability of Intel's AVX registers to speculative execution attacks was reported to Intel not once, but twice, in the summer of 2018, CAC ¶¶ 9, 135-44, 145-48, yet Intel chose to keep this a secret—and to keep selling defective, unfixed, and unpatched processors until no earlier than August 2023, when it permitted Downfall to be publicly disclosed, *id.* ¶¶ 12-13, 154-55.

application . . . and each peripheral," *In re Intel CPU Litig.*, 2023 WL 7211394, at *1 —particularly as to encryption, *id.* ¶¶ 154-81, the segmentation of privileged and non-privileged memory and system resources, *id.* ¶¶ 6, 7, 94, 165, 179, the movement of large amounts of data to and from memory, *id.* ¶¶ 190-92, and the necessary evaluation of conditional instructions present in **every** computer program that runs on a CPU, *id.* ¶¶ 76-78. Moreover, as explained above, the vulnerability itself goes to the heart of the CPU's functionality, including its ability to execute instructions in computer programs (particularly, conditional instructions that appear in every computer program), *id.* ¶¶ 89-96; safely process and store sensitive encryption keys, *id.* ¶¶ 154-81; and maintain segmentation between non-privileged and privileged computer programs and memory, *id.* ¶¶ 6, 7, 94, 165, 179.

These allegations, which are pleaded with particularity, are accompanied by a pre-complaint conjoint study confirming within statistical significance that the alleged defect destroys most of the value of the CPUs and computers purchased by plaintiffs. CAC ¶¶ 224-39. The CAC includes allegations based on industry participants, *id.* ¶¶ 59-111, Intel's own marketing, *id.* ¶¶ 196-220, Plaintiffs' expectations and experiences with the defective products, *see, e.g.*, *id.* ¶¶ 22-24, 26-28, 30-32, 35-36, and surveys and statistical analysis, *see id.* ¶¶ 224-39. This is far from the "no allegations" pleaded on the subject in the Spectre and Meltdown litigation.

***Mitigation and the UCL Balancing Test.*** As the Ninth Circuit held, plaintiffs in the Spectre and Meltdown failed to allege that the mitigation of Spectre and Meltdown, which resulted in degraded performance, violated the California UCL. *In re Intel CPU Litig.*, 2023 WL 7211394, at *2. As the Ninth Circuit explained, plaintiffs did not plead that the "utility of the patches (that is, at least partial protection from security attacks) was outweighed by the alleged harm to Plaintiffs by way of reduced processor performance." *Id*. Notably, the Ninth Circuit held that unlike here, where Intel and PC manufacturers have forced mitigations on most users through automatic and critical firmware updates, CAC ¶ 185, Intel told users ***not*** to implement its initial mitigation for Spectre and Meltdown. As such, plaintiffs could not satisfy the UCL balancing test. *In re Intel CPU Litig.*, 2023 WL 7211394, at *2.

Here, however, the CAC alleges with particularity that the harm from Intel's mitigation of downfall—a performance degradation of as much 50%—causes harm that outweighs the vulnerability itself. *See, e.g.*, CAC ¶ 184 ("Intel ultimately released supposed mitigations in late 2023, but the medicine was on par with the disease: Intel's mitigation destroyed CPU performance for certain, critical processing tasks."). Indeed, mitigation results in a performance degradation precisely because it requires impairing or disabling the vital CPU functionality that was defectively implemented by Intel. *See id.* ¶ 183 ("[M]itigation requires disabling the AVX instructions or changing Intel's hardware-defined instruction set."). Put simply, plaintiffs' UCL claims concerning Intel's "mitigation" are very unlikely to result in dismissal.

***Non-California Claims.*** Intel's supposedly dispositive arguments rely on interpretations of California law, including with regards to the "central function" test and to other requirements for an omission-based claim. The Complaint here, however, also asserts consumer protection, unjust enrichment, and implied warranty claims under Illinois, Kansas, Oregon, and Minnesota law. CAC ¶¶ 443-584. Intel makes no attempt to address these claims, let alone explain why they are likely to be dismissed, thereby justifying a discovery stay. Moreover, the Ninth Circuit's recent decision relies entirely on California law for its affirmance of the district court's decisions below. *See In re Intel CPU Litig.*, 2023 WL 7211394, at *1-2 (addressing the California omission standard and the California UCL). Intel is misleadingly silent on the subject, pretending instead that complete dismissal of all asserted claims is a forgone conclusion.

### B. Intel's Motion to Dismiss Cannot Be Granted Without Discovery

Intel's motion to dismiss could certainly be denied without discovery. But granting Intel's dismissal motion is not possible without discovery for one obvious reason: Intel seeks to dismiss claims on the basis that the defect in its chips is limited to a "theoretical hacking technique." Mot. at 2; *see also id.* at 3 ("neither Plaintiffs here nor any other plaintiffs since January 2018 has ever alleged *any* actual hack using these complex techniques"), *id.* at 7 ("a new *potential* hacking technique was discovered by a researcher"). But the CAC claims otherwise, including by screenshotting videos of an ***actual*** hack being performed to steal AES keys and other sensitive information, exploiting the design defect affecting Plaintiffs' Intel CPUs. CAC ¶ 158. The CAC also

explains that the Downfall class of attack exploits secret buffers, working in a manner that would not necessarily (or even likely) be evident to a victim. *Id.* ¶¶ 155-73. This serious, real-world problem in Intel CPUs is presumably why Intel, despite telling this Court via its lawyers that the flaw in its chips is just a "theoretical hacking technique," actually pushed a microcode update to those same chips that kneecaps their performance, cutting their processing capability in **half** for certain common workloads. *Id.* ¶¶ 182-220.

Despite the above, Intel argues that this case is simply about a "theoretical" problem and that its CPUs were not (and are not) actually being hacked, and are not **actually** at serious, imminent security risk. *See* Mot. at 2, 3, 7. These are factual assertions, and they contradict the well-pleaded allegations of the CAC. Discovery will show who is actually correct on this point—but public information about the affected CPUs' actual vulnerabilities, and Intel's behavior hobbling its own chips to try to for a patch, strongly indicates who that will be.

## CONCLUSION

The Court should deny Intel's motion.

-13-   Case No. 4:23-cv-05761-HSG
PLAINTIFFS' OPPOSITION TO INTEL'S MOTION TO STAY DISCOVERY

| | | |
|---|---|---|
| 1 | DATED: February 9, 2024 | Respectfully submitted, |
| 2 | | **BATHAEE DUNNE LLP** |
| 3 | | By: /s/ Brian J. Dunne |
| 4 | | Yavar Bathaee (CA 282388)<br>yavar@bathaeedunne.com |
| 5 | | Andrew C. Wolinsky (CA 345965)<br>awolinsky@bathaeedunne.com |
| 6 | | 445 Park Avenue, 9th Floor<br>New York, NY 10022 |
| 7 | | Tel: (332) 322-8835 |
| 8 | | |
| 9 | | Brian J. Dunne (CA 275689)<br>bdunne@bathaeedunne.com |
| 10 | | Edward M. Grauman (*pro hac vice*)<br>egrauman@bathaeedunne.com |
| 11 | | 900 South MoPac Expressway<br>Barton Oaks Plaza I, Suite 300 |
| 12 | | Austin, TX 78746<br>Tel: (213) 462-2772 |
| 13 | | |
| 14 | | *Attorneys for Plaintiffs and the Proposed Class* |