**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice* to be filed)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
(213) 462-2772

*Attorneys for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| DARQUES SMITH, et al., | Case No. 4:23-cv-05761-HSG |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO INTEL'S MOTION TO DISMISS** |
| v. | |
| INTEL CORPORATION, | Hon. Haywood S. Gilliam, Jr. |
| Defendant. | Hearing Date: May 2, 2024 |
| | Time: 2:00 p.m. |
| | Courtroom 2, 4th Floor |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 3

LEGAL STANDARD ............................................................................................................. 5

ARGUMENT ........................................................................................................................ 5

I.      PLAINTIFFS HAVE ADEQUATELY PLEADED FRAUD CLAIMS ............................... 5

        A.      The Complaint Plausibly Alleges a Claim for Fraud by Omission .......................... 5

                1.      The CAC Pleads Intel's Exclusive Knowledge of the Defect ................ 6

                2.      Intel Had a Duty to Disclose When It Sold the Affected CPUs ............. 8

                3.      The CAC Pleads Reliance for Claims that Require It .......................... 11

                4.      Plaintiffs State Fraud Claims under the Fraud Prong of the UCL ........ 11

        B.      The CAC Plausibly Pleads FAL and CLRA Claims ............................................. 12

II.     PLAINTIFFS HAVE ADEQUATELY PLEADED A CLAIM UNDER THE UNFAIR
        PRONG OF THE UCL ........................................................................................... 12

III.    PLAINTIFFS HAVE ADEQUATELY PLEADED A CLAIM UNDER THE
        ULAWFUL PRONG OF THE UCL .......................................................................... 15

IV.     PLAINTIFFS HAVE STATED IMPLIED WARRANTY CLAIMS ................................ 15

V.      PLAINTIFFS STATE QUASI-CONTRACT AND UNJUST ENRICHMENT
        CLAIMS ............................................................................................................... 20

VI.     PLAINTIFFS HAVE ADEQUATELY PLEADED A NEGLIGENCE CLAIM ............... 23

VII.    LEAVE TO AMEND ............................................................................................. 25

CONCLUSION .................................................................................................................... 25

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Adirondack Combustion Techs., Inc. v. Unicontrol, Inc.*,
    17 A.D.3d 825 (N.Y. App. Div. 2005)............................................................................ 25

4

5

*Albrosco Ltd. v. Prince Agri Prods., Inc.*,
    545 F. Supp. 3d 656 (C.D. Ill. 2021)............................................................................... 17

6

*Anderson v. Apple Inc.*,
    500 F. Supp. 3d 993 (N.D. Cal. 2020) .............................................................................. 8

7

8

*Arabian v. Organic Candy Factory*,
    2018 WL 1406608 (C.D. Cal. Mar. 19, 2018) ............................................................... 17

9

10

*Bagel v. Am. Honda Motor Co.*,
    132 Ill. App. 3d 82 (1985).............................................................................................. 18

11

*Baker v. Nutrien Ag Sols., Inc.*,
    2022 WL 3142065 (E.D. Cal. Aug. 5, 2022) .................................................................. 24

12

13

*Becerra v. Gen. Motors LLC*,
    241 F. Supp. 3d 1094 (S.D. Cal. 2017) ........................................................................... 17

14

15

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................................... 5

16

*Belyea v. Greensky, Inc.*,
    2021 WL 1338549 (N.D. Cal. Apr. 9, 2021) ................................................................. 11

17

18

*Berryman v. Merit Property Management, Inc.*,
    152 Cal. App. 4th 1544 (2007)....................................................................................... 15

19

20

*Best Carpet Values, Inc. v. Google LLC*,
    2021 WL 4355337 (N.D. Cal. Sept. 24, 2021) .............................................................. 15

21

*Birdsong v. Apple, Inc.*,
    590 F.3d 955 (9th Cir. 2009).......................................................................................... 16

22

23

*CHMM, LLC v. Freeman Marine Equip., Inc.*,
    791 F.3d 1059 (9th Cir. 2015)........................................................................................ 24

24

25

*Clemens v. DaimlerChrysler Corp.*,
    534 F.3d 1017 (9th Cir. 2008)........................................................................................ 18

26

*Corzine v. Whirlpool Corp.*,
    2016 WL 6476172 (N.D. Cal. Nov. 2, 2016) ................................................................ 16

27

28

*Daniel v.* Ford *Motor Co.*,
  806 F.3d 1217 (9th Cir. 2015) (N.D. Cal. Nov. 2, 2016) ........................................................ 16

*Day v. Advanced Micro Devices, Inc.*,
  2023 WL 6998188 (N.D. Cal. Oct. 23, 2023) ...................................................................... 16, 19

*Dhital v. Nissan N. Am., Inc.*,
  84 Cal. App. 5th 828 (2022) .............................................................................................. 6

*Doe v. CVS Pharmacy, Inc.*,
  982 F.3d 1204 (9th Cir. 2020) .......................................................................................... 13

*E. River S.S. Corp. v. Transamerica Delaval Inc.*,
  476 U.S. 858 (1986)) ....................................................................................................... 24

*Elward v. Electrolux Home Prod., Inc.*,
  214 F. Supp. 3d 701 (N.D. Ill. 2016) ................................................................................. 19

*Gilbert Fin. Corp. v. Steelform Contracting Co.*,
  82 Cal. App. 3d 65 (1978) ................................................................................................ 18

*Grp. Health Plan, Inc. v. Philip Morris Inc.*,
  621 N.W.2d 2 (Minn. 2001) .............................................................................................. 11

*Hadley v. Kellogg Sales Co.*,
   243 F. Supp. 3d 1074 (N.D. Cal. 2017) ............................................................................. 12

*Hauter v. Zogarts*,
  14 Cal. 3d 104 (1975) ....................................................................................................... 17

*Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*,
  910 P.2d 839 (Kan. 1996) ................................................................................................. 21

*Hernandez v. Pistotnik*,
  58 Kan. App. 2d 501 (2020) .............................................................................................. 11

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ............................................................................................ 5

*Hodsdon v. Mars, Inc.*,
  891 F.3d 857 (9th Cir. 2018) ......................................................................................... 8, 12

*Hoffman v. 162 North Wolfe LLC*,
  228 Cal. App. 4th 1178 (2014) ........................................................................................... 6

*In re Carrier IQ, Inc.*,
  78 F. Supp. 3d 1051 (N.D. Cal. 2015) ........................................................................... 16, 21

*In re Intel Corp. CPU Mktg., Sales Pracs. & Prod. Liab. Litig.*,
  2020 WL 1495304 (D. Or. Mar. 27, 2020) ......................................................................... 17

PLAINTIFFS' OPPOSITION TO INTEL'S MOTION TO DISMISS

*In re Intel Corp. CPU Mktg., Sales Pracs. & Prod. Liab. Litig.*,
  2021 WL 1198299 (D. Or. Mar. 29, 2021) ........................................................... 7

*In re Intel Corp. CPU Mktg., Sales Pracs. & Prod. Liab. Litig.*,
  2023 WL 7211394 (9th Cir. Nov. 2, 2023) ................................................... *passim*

*In re Lenovo Adware Litigation*,
  2016 WL 6277245 (N.D. Cal. 2016) ...................................................................... 25

*In re MyFord Touch Cons. Litig.*,
  46 F. Supp. 3d 936 (N.D. Cal. 2014) .............................................................. 18, 19

*In re Natera Prenatal Testing Litig.*,
  2023 WL 3370737 (N.D. Cal. Mar. 28, 2023) ................................................... 18

*In re Nexus 6P Prod. Liab. Litig.*,
  293 F. Supp. 3d 888 (N.D. Cal. 2018) ................................................................ 16

*In re NVIDIA GPU Litigation*,
  2009 WL 4020104 (N.D. Cal. 2009)..................................................................... 25

*In re Pork Antitrust Litig.*,
  495 F. Supp., 3d 753 (D. Minn. 2020) ................................................................ 21

*In re Rust-Oleum Restore Mktg., Sales Pracs. & Prod. Liab. Litig.*,
  155 F. Supp. 3d 772 (N.D. Ill. 2016) .................................................................. 20

*In re Seagate Tech. LLC Litig.*,
  2017 WL 3670779 (N.D. Cal. Aug. 25, 2017)...................................................... 21

*In re Tobacco II Cases*,
  46 Cal. 4th 298 (2009) ........................................................................................ 12

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prod. Liab. Litig.*,
  754 F. Supp. 2d 1145 (C.D. Cal. 2010)................................................................ 18

*Isip v. Mercedes-Benz USA, LLC*,
  155 Cal. App. 4th 19 (2007)................................................................................ 16

*John Michael Assocs., Inc. v. BlueStem Mgmt. Advisors LLC*,
  2023 WL 5379569 (D. Kan. 2023) ...................................................................... 21

*Kalitta Air, L.L.C. v. Cent. Tex. Airborne Sys., Inc.*,
  315 F. App'x 603 (9th Cir. 2008) ....................................................................... 24

*Klass v. Twin City Fed. Sav. & Loan Ass'n*,
  291 Minn. 68, 190 N.W.2d 493 (1971)................................................................ 21

*Kulp v. Munchkin, Inc.*,
  2023 WL 4843340 (C.D. Cal. 2023) ................................................................... 12

*Larisa's Home Care, LLC v. Nichols-Shields*,
    404 P.3d 912 (Or. 2017) ................................................................................. 21

*Leppert v. Champion Petfoods USA Inc.*,
    2019 WL 216616 (N.D. Ill. Jan. 16, 2019) ..................................................... 20

*Lessin v. Ford Motor Co.*,
    2020 WL 6544705 (S.D. Cal. Nov. 6, 2020) ................................................... 17

*LiMandri v. Judkins*,
    60 Cal. Rptr. 2d 539 (Ct. App. 1997) ......................................................... 8, 10

*McLellan v. Fitbit, Inc.*,
    2018 WL 2688781 (N.D. Cal. Jun. 5, 2018) .................................................... 17

*MH Pillars Ltd. v. Realini*,
    277 F. Supp. 3d 1077 (N.D. Cal. 2017) .......................................................... 21

*Mier v. CVS Pharmacy, Inc.*,
    2021 WL 1559367 (C.D. Cal. 2021) ............................................................... 13

*Moore v. Mars Petcare US, Inc.*,
    966 F.3d 1007 (9th Cir. 2020) ........................................................................ 12

*Moran v. Prime Healthcare Mgmt., Inc.*,
    3 Cal. App. 5th 1131 (2016) ........................................................................... 15

*Mui Ho v. Toyota Motor Corp.*,
    931 F. Supp. 2d 987 (N.D. Cal. 2013) ............................................................ 12

*Peterson v. Cellco P'ship*,
    164 Cal. App. 4th 1583 (2008) ....................................................................... 21

*Pisano v. Am. Leasing*,
    146 Cal. App. 3d 194 (1983) .......................................................................... 17

*Schmitt v. Kaiser Found. Health Plan of Wash.*,
    965 F.3d 945 (9th Cir. 2020) .......................................................................... 25

*Sheeley v. Wilson Sporting Goods Co.*,
    2017 WL 5517352 (N.D. Ill. Nov. 17, 2017) .................................................. 19

*Shoop v. DaimlerChrysler Corp.*,
    371 Ill. App. 3d 1058 (2007) .......................................................................... 17

*Star Furniture Co. v. Pulaski Furniture Co.*,
    171 W. Va. 79 (1982) ...................................................................................... 24

*Taleshpour v. Apple*,
    2021 WL 1197494 (N.D. Cal. Mar. 30, 2021) ................................................ 11

*Thacker v. Menard, Inc.*,
  105 F.3d 382 (7th Cir. 1997) ............................................................................... 11

*Villanueva v. Am. Honda Motor Co.*,
  2019 WL 8112467 (C.D. Cal. Oct. 10, 2019) ...................................................... 19

*Williams v. Gerber Prod. Co.*,
  552 F.3d 934 (9th Cir. 2008) ............................................................................... 12

Wilson v. Hewlett-Packard,
  668 F.3d 1136 (9th Cir. 2012) ............................................................................... 7

Wolverton v. Stanwood,
  565 P.2d 755 (Or. 1977) ...................................................................................... 11

**Statutes**

Cal. Civ. Code § 1559 ................................................................................................ 18

Cal. Civ. Code §§ 1790, 1792 ................................................................................... 20

Kan. Stat. Ann. § 84-2-314 ....................................................................................... 15

## PRELIMINARY STATEMENT

Plaintiffs purchased Intel CPUs, or computers built around Intel CPUs, that suffer from a design defect. Specifically, Intel's CPUs contain a defective speculative execution system associated with the AVX instruction set that causes malfunction of the CPU's cache memory system, segmentation protections designed to secure sensitive system resources, and instructions designed to handle nearly every encryption/decryption task performed on a modern computer. The AVX instructions are responsible for moving large amounts of information to and from memory and for the processing and storage of encryption-related data, including secret encryption keys. As such, Intel's defective design impairs the CPU's ability to process instructions and operate vital peripherals on a computer, including external memory. This defect came to light in 2023, a year after a Google engineer discovered secret buffers associated with the AVX instructions and devised simple computer programs that exploited the defect to extract sensitive information, such as AES encryption keys used in a computer's most sensitive transactions, including secure networking and data encryption. The Google researcher named his exploits of Intel's defective AVX system "Downfall." This was not a surprise to Intel. To the contrary, Intel was warned about speculative execution problems with its AVX instructions *twice* in 2018. It not only failed to address the problem by redesigning the buffers and caching systems associated with the AVX instructions, it suppressed the defect by concealing the very existence of the AVX buffers and CPU components that ultimately caused the defect.

This was not the first time Intel had implemented a defective design of its speculative execution systems. Intel's CPUs prior to 2018 had suffered from a similar flaw, which was exploited using malicious software patterns referred to as Spectre and Meltdown. In the wake of those defects, Intel promised to redesign its 8th generation and subsequent CPUs at the hardware level, and Intel implemented several mitigations that caused severe impairments to the speculative execution systems and performance of its CPUs. By the time Intel sold the CPUs at issue here, it not only knew that the AVX instructions were defective in similar ways to its pre-8th generation CPUs, but that if properly mitigated, the CPUs would experience severe degradation in performance. Intel chose to sell its 8th-11th generation CPUs without mitigations, so as to avoid telling its customers

that its CPUs were in fact defective and, if sold with mitigations, would operate at a fraction of the speeds of the CPUs sold by Intel's competitors. Unlike the defect exploited by Spectre and Meltdown, this new defect was knowingly included in millions of Intel CPUs, and Intel knew that without mitigations, those CPUs were not in fact commercially competitive, viable, or saleable.

Plaintiffs assert claims for fraud, unfair trade practices, breach of implied warranty, unjust enrichment/quasi-contract, and negligence. Instead of addressing the defect at issue here, Intel's motion to dismiss proffers the misleading premise that the defect is the same as the one exploited by Spectre and Meltdown, and curiously argues that because Intel won a lawsuit based on that defect, it's immune as a matter of law for all time from product liability suits involving its CPUs.

Intel's position leads to an absurd result. Consider a car company that designs, markets, and sells a sedan that, when it has a forceful collision at a specific angle, explodes catastrophically. A safety tester discovers this serious defect in 2017 and informs the carmaker; in 2018 the carmaker issues a recall on its current model sedan and publicly promises to fix the root problem going forward. Shortly thereafter, two independent safety testers tell the carmaker that other impact points appear to have similar explosion risks. Despite its promises, the company does not reengineer its sedans, but instead designs, markets, and sells several further generations with the very explosion risks identified in 2018. In 2022, a safety tester explodes several newer-model sedans in front-end crash tests; he informs the carmaker. In 2023, the carmaker offers a recall that installs a speed governor on defective sedans: the "patched" sedans cannot travel over 35 miles per hour, and as a result do not go fast enough to explode. According to Intel, the above fact pattern does not give rise to any claim, as a matter of law, under California statutory or common law, nor under the consumer protection, warranty, or unjust enrichment laws of four other states. Intel's justification for this is that no consumer has yet been blown up (even though sedans have, indeed, exploded in tests), and that a previous class action based on 2017-era sales and conduct was dismissed on the pleadings. On the former point, a consumer does not have to be blown up to have an overcharge claim when her sedan is known to explode (reducing its resale value) and can no longer drive over 35 miles per hour because the manufacture "patched" it (frustrating the basic and essential reason for which the sedan was purchased). On the latter point, the unpublished Ninth Circuit opinion concerning Intel's

Spectre/Meltdown class action sweeps far less broadly than Intel says it does, and is plainly distinguishable based on the allegations in the Class Action Complaint ("CAC").

As explained below, the CAC adequately pleads every element of every asserted claim. Intel's motion should be denied.

## BACKGROUND

Modern CPUs have two core functionalities that are at issue in this action: "speculative execution," which allows CPUs to execute instructions out of order and even to predict the outcome of future instructions, Dkt. 1, Class Action Complaint (CAC) ¶¶ 75-88, and "segmentation," meaning that privileged computer programs and their resources are segregated from programs run by users, *id.* ¶ 59-74. In the modern era, speculative execution is required for sufficient, expected CPU performance in ordinary computing tasks. *Id.* ¶¶ 75-88, 182-220. As alleged in the CAC, Intel defectively designed these core functions in its CPUs. When Intel's CPUs speculatively execute instructions, they are supposed to discard the results of an execution if the CPU guessed the instruction wrong. *Id.* ¶¶ 75-88. Instead, Intel's CPUs leave "side effects," or data remains in temporary buffers or in the CPU's cache memory, even after the speculative execution's results are discarded. *Id.* ¶¶ 89-96. Intel's CPUs also violate segmentation by allowing speculatively executed code to see system resources and information that only an operating system or privileged computer programs should be able to see. *Id.*

In January 2018, it was publicly revealed that Intel's CPUs suffered from vulnerabilities known as Spectre and Meltdown. CAC ¶ 97. These were attack vectors in Intel CPUs[1] that relied on speculative execution, an important functionality of modern microprocessors. *Id.* ¶¶ 96-111. In response to the public disclosure of the Spectre/Meltdown vulnerabilities, Intel promised a hardware fix for future generations of its CPUs. *Id.* ¶¶ 126-27. Around the time Intel was making these promises, in the summer of 2018, Intel received two separate vulnerability reports from third parties

---

[1] Other types of processors, including AMD and some ARM-based processors, were vulnerable to the speculative execution vulnerabilities referred to as Spectre and Meltdown. Intel was, as far as Plaintiffs can tell, the only major chipmaker that failed to fix its chips' vulnerability to speculative execution attacks like Downfall, *see, e.g.,* CAC ¶ 171 ("AMD CPUs do not appear vulnerable to Downfall attacks")—despite telling consumers and the public otherwise, *id.* ¶ 126.

1   indicating that a set of instructions on Intel's CPUs, called Advanced Vector Extensions ("AVX"),

2   was vulnerable to speculative execution attacks. *Id.* ¶¶ 130-52. Intel's AVX instructions perform

3   critical CPU functions associated with encryption, media, gaming, and execution of memory-

4   optimized computer programs. Intel acknowledged both reports. *Id.* ¶¶ 131-33.

5        Despite this knowledge, and its promise to redesign its CPUs to mitigate speculative

6   execution vulnerabilities, Intel did nothing. CAC ¶¶ 129, 149-54. It did not fix its then-current chips,

7   and over three successive generations of CPUs, Intel did not redesign its CPUs to ensure that AVX

8   instructions would operate securely when the CPU speculatively executed them. *Id.* ¶¶ 154-81.

9   Instead, Intel implemented secret buffers associated with the AVX instructions and failed to disclose

10  them to anyone. *Id.* ¶¶ 159-65. These secret buffers, coupled with side effects left in CPU cache,

11  opened what was tantamount to a back door in Intel's CPUs. *Id.* ¶¶ 158-73. This back door would

12  allow an attacker to use AVX instructions to easily obtain sensitive information—including AES

13  encryption keys, the foundation of modern secure networking, secure communications, and secure

14  data storage—from memory by exploiting the design flaw that Intel had told consumers it had fixed

15  after Spectre and Meltdown. *Id.* ¶¶ 154-81. Intel knowingly sold these defective CPUs for years.

16  CAC ¶¶ 179-81. Then in 2022, a Google engineer discovered the defect with the AVX instructions

17  and reported to Intel that its CPUs, particularly its 6th through 11th generation CPUs, were

18  vulnerable to speculative execution attacks—the same sort of attacks that gave rise to Spectre and

19  Meltdown years earlier, which Intel had promised to fix. *Id.* ¶¶ 154-81. Rather than mitigating the

20  damage to consumers, Intel asked the engineer not to publish the results. *Id.* ¶ 155.

21       Approximately a year after Intel was informed of the AVX vulnerability, the Google

22  engineer published an academic paper and website disclosing Intel's secret AVX buffers and its

23  CPUs' continuing vulnerability to the same category of attacks as Spectre and Meltdown, which the

24  Google engineer called "Downfall." CAC ¶ 156, 158. Even though Intel had told customers that it

25  engineered a hardware fix for the design flaw that gave rise to Spectre and Meltdown vulnerabilities

26  since the release of its 9th generation CPUs, in reality all of Intel's 9th generation CPUs (and later)

27  incorporated this flaw. *Id.* ¶¶ 161-81. Indeed, since 2018, before many of these supposedly fixed

28  CPUs were released, Intel knew its AVX instructions were at risk from the same class of attacks as

Spectre and Meltdown. *Id.* ¶¶ 130-53. When this became public, Intel issued a microcode update, which was said by Intel to mitigate the Downfall vulnerability. CAC ¶¶ 182-95. The flaw in Intel's "mitigation," however, was that it handicapped the speculative execution and branch prediction functionality that is central to the function of every modern CPU, resulting in as much as a 50% performance degradation in affected CPUs. *Id.* ¶¶ 182-220. Plaintiffs are left with defective CPUs, or computers incorporating them, that must be severely impaired in performance and functionality to "mitigate" their vulnerability to Downfall. These are not the products they purchased. CAC ¶¶ 221-49. On November 8, 2023, Plaintiffs filed this action, seeking relief for themselves and putative classes of Intel CPU or Intel-based computer purchasers. Intel moved to dismiss.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018) (citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts do not weigh the facts at the Rule 12(b)(6) stage, but merely assess the sufficiency of plaintiff's allegations. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## ARGUMENT

## I.   PLAINTIFFS HAVE ADEQUATELY PLEADED FRAUD CLAIMS

### A.   The Complaint Plausibly Alleges a Claim for Fraud by Omission

Plaintiffs assert omission-based fraud claims under California law based on Intel's knowing sale of defective CPUs without disclosure of the defect. CAC ¶¶ 315-35 (Count 1, UCL), 336-59 (Count 2, CLRA), 362-72 (Count 3, FAL), 373-86 (Count 4, Fraud by Omission).[2] To state such a claim, plaintiffs must plead: (1) an actionable omission; (2) knowledge of falsity; (3) intent to defraud or induce reliance; (4) justifiable reliance; and (5) resulting damage. *Dhital v. Nissan N.*

---

[2] Plaintiffs' fraud allegations also adequately plead claims in the alternative under the consumer protection statutes of Oregon (CAC ¶¶ 455-70, Count 10), Kansas (*id.* ¶¶ 471-78 Count 11), Illinois (*id.* ¶¶ 506-14, Count 14), and Minnesota (*id.* ¶¶ 558-73, Count 18).

*Am., Inc.*, 84 Cal. App. 5th 828, 843-44 (2022) (citing *Hoffman v. 162 North Wolfe LLC*, 228 Cal. App. 4th 1178, 1185-86 (2014)). Intel's arguments as to these elements are meritless.

### 1.    The CAC Pleads Intel's Exclusive Knowledge of the Defect

The CAC pleads pre-sale knowledge of the alleged defect as to each Plaintiff. Specifically, the CAC alleges that in the wake of Intel's mitigation and redesign efforts relating to the Spectre and Meltdown defects in its pre-8th generation CPUs, Intel received two reports of speculative execution vulnerabilities in its AVX instruction set, CAC ¶¶ 130-53—instructions that implemented central functionality of Intel's CPUs, including as to encryption, *id.* ¶¶154-81, caching, *id.* ¶¶ 7, 10, 72-73, 85, 88, 90, 93, resource segmentation, *id.* ¶¶ 6, 7, 94, 165, 179, and memory input-output operations, *id.* ¶¶ 190-92. At the time, Intel had pledged to redesign its CPUs to avoid speculative execution flaws such as Spectre and Meltdown, and as part of that effort, Intel purported to redesign instruction sets that utilized instruction buffers. *Id.* ¶¶ 10, 126-27, 133-34. Despite being alerted twice to a flaw in its AVX instructions, Intel made no changes to its AVX instructions as part of its redesign and mitigation efforts. CAC ¶¶ 130-53. Worse, Intel ***kept secret*** the buffers associated with the AVX instructions, which were ultimately the source of the Downfall exploit at issue in this case. *Id.* ¶¶ 161-63. Indeed, the CAC alleges that the secrecy, coupled with the unique sensitivity of the AVX instructions, created an undisclosed backdoor to encryption applications that run on Intel's affected CPUs. *Id.* ¶¶ 10, 149. Moreover, in light of its mitigation efforts for Spectre and Meltdown, Intel knew that mitigation of its AVX vulnerabilities would require disabling vital speculative execution functionality for AVX instructions, resulting in severely impaired CPU performance. *Id.* ¶ 150; *see also id.* ¶¶ 112-29. Put simply, Intel knew about the alleged defect, and that mitigation of the defect would impair CPU performance "at the time of sale" to each of the Plaintiffs. *Wilson v. Hewlett-Packard*, 668 F.3d 1136, 1145 (9th Cir. 2012).

Intel has nothing to offer the Court on these alleged facts. Rather, Intel curiously points to a decision in the *Intel* MDL (a motion to dismiss opinion) to establish a factual premise in this litigation—that the defect here was publicly known because it was publicly known in the Spectre and Meltdown litigation. Mot. at 11-12. As an initial matter, Intel's public knowledge argument is entirely inconsistent with the allegations here. The CAC expressly pleads that (a) the Downfall

exploit, and its related defect, were not discovered until 2022 when a Google engineer discovered secret buffers in Intel's chips and exploited them, *id.* ¶¶ 154-81; (b) the Downfall exploit was not publicly disclosed until a year later because **Intel asked** the Google researcher not to publish his findings (a nonsensical request if in fact the defect was already publicly known), *id.* ¶ 155; and (c) the very existence of Intel's AVX buffers was not known and could not have been known by anyone other than Intel at the time the defective CPUs were sold, *id.* ¶¶ 156, 158. As the Google engineer that discovered the defect explained, "We introduce Gather Data Sampling (GDS) that exploits the gather instruction to steal stale data from *previously-undisclosed CPU components: SIMD register buffers*." *Id.* ¶ 160 (emphasis in original). The CAC is clear that for years Intel had exclusive knowledge of the defect. *Id.* ¶ 161 ("Notably, the buffers had not been previously disclosed by Intel. Intel, of course, knew these buffers existed."); *see also id.* ¶¶ 9, 135-52 (Intel knew of defect in AVX instructions in 2018). These allegations—which Intel does not address—stand in stark contrast to the facts alleged (and conceded) as to public knowledge in the Spectre and Downfall litigation years prior to identification and disclosure at issue here. *In re Intel Corp. CPU Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2021 WL 1198299, at *7 (D. Or. Mar. 29, 2021) ("Based on the allegations in the Amended Complaint that broadly allege public disclosure of the alleged defects and counsel's admission that the publicly-disclosed information relates to both alleged defects, the Court finds that Plaintiffs have not sufficiently alleged that Intel suppressed or concealed the alleged defects.").

Finally, in a footnote, Intel argues the CAC does not allege that Intel knew about the defect when Plaintiffs purchased their CPUs. Mot. at 12 n.10. This is demonstrably false. The CAC alleges Intel's knowledge in 2018, and Plaintiffs allege that they purchased well after that date. *See* CAC ¶¶ 21 (Smith: February 2022), 25 (Waltrip: June 2020); 29 (Cameron: February 2020); Cordova (January 2020); 37 (Worley: June 2022). At bottom, all Intel offers the Court is the flawed argument that because the company previously won a motion to dismiss regarding a speculative execution defect, it is now immune from suit. Unlike with Spectre and Meltdown, however, here Intel knew about the defect (which it had promised to fix), knew that fixing it would require impairing the functionality of the CPU (which it learned from the Spectre and Meltdown litigation), and sold defective CPUs anyway—until it was caught by a Google engineer in 2022, who at Intel's behest,

1   did not make his findings public until 2023. A plaintiff need only plead that the defendant had

2   "superior knowledge" of the defect, *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1014–15 (N.D.

3   Cal. 2020); the CAC goes well beyond that and pleads **exclusive** knowledge by Intel.

4              **2.    Intel Had a Duty to Disclose When It Sold the Affected CPUs**

5          To establish a duty to disclose the defect, Plaintiffs must plead "(1) the omission is material,

6   (2) 'the defect was central to the product's function,' and (3) one of four factors discussed in

7   *LiMandri v. Judkins*, 60 Cal. Rptr. 2d 539 (Ct. App. 1997), is present." *In re Intel CPU Litig.*, 2023

8   WL 7211394, at *1 (cleaned up and citing *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861 (9th Cir. 2018)).

9   The CAC pleads all three elements of this test.

10         *Materiality*. "For a non-disclosed fact to be material, a plaintiff must show that if the omitted

11  information had been available, the plaintiff would have been aware of it and behaved differently."

12  *In re Apple In-App Purchase Litig.*, 855 F. Supp. 2d 1030, 1039 (N.D. Cal. 2012) (citations omitted).

13  The allegations here easily meet this standard. To begin with, each Plaintiff alleges they would not

14  have bought at the price they had paid if they had known about the defect. CAC ¶¶ 24, 28, 32, 36,

15  41. Plaintiffs also conducted two conjoint studies prior to filing the CAC which confirmed that the

16  defect caused a material difference in consumers' marginal-willingness-to-pay. *Id.* at 225.

17         *Central Function.* "[T]he central functionality of the product is not based on subjective

18  preferences about a product." *Hodsdon*, 891 F.3d at 864. Rather, such a defect is one that "renders

19  those products incapable of use by any consumer." *Id.* Here, the CAC pleads that the defect impairs

20  the central functionality of the product with particularity—based on facts that are not at all

21  subjective. CAC ¶¶ 192-220. Specifically, the CAC alleges that the defect impairs the CPUs cache

22  memory—extremely fast memory embedded in the CPU that is necessary for computation, *id.* ¶¶ 7,

23  10, 72-73, 85, 88, 90, 93. The CAC also alleges that the defect impairs the AVX vector instruction

24  set (which is used to store and process encryption keys used in virtually every modern computer

25  application), *id.* ¶¶ 154-81, and the CPU's segmentation functionality, which prevents non-

26  privileged computer programs from accessing sensitive computer resources and memory, *id.* ¶¶ 6,

27  7, 94, 165, 179; *see also* ¶¶ 59-74. Together, these effects of Intel's defective speculative execution

28  design prevent its CPUs from "performing all necessary computations for each application . . . and

each peripheral," *In re Intel CPU Litig.*, 2023 WL 7211394, at *1. The CAC pleads with particularity the effects of the defect, including as to encryption, *id.* ¶¶ 154-81, segmentation of privileged and non-privileged memory and system resources, *id.* ¶¶ 6, 7, 94, 165, 179, movement of large amounts of data to and from memory, *id.* ¶¶ 190-92, and the necessary evaluation of conditional instructions present in every computer program that runs on a CPU, *id.* ¶¶ 76-78. The vulnerability itself goes to the heart of the CPU's functionality, including its ability to execute instructions in computer programs (particularly, conditional instructions that appear in every computer program), *id.* ¶¶ 89-96; safely process and store sensitive encryption keys, *id.* ¶¶ 154-81; and maintain segmentation between non-privileged and privileged computer programs and memory, *id.* ¶¶ 6, 7, 94, 165, 179.

These factual allegations are objectively corroborated—and in fact quantified in value—in the CAC. A precomplaint conjoint study confirms within statistical significance that the alleged defect destroys most of the value of the CPUs and computers purchased by plaintiffs. CAC ¶¶ 224-39. The CAC includes allegations based on industry participants, *id.* ¶¶ 113-95, Intel's own marketing, *id.* ¶¶ 196-220, Plaintiffs' expectations and experiences with the defective products, *see, e.g.*, *id.* ¶¶ 22-24, 26-28, 30-32, 35-36, and surveys and statistical analysis, *see id.* ¶¶ 224-39.

Intel ignores all of these allegations. Instead, it falls back on its tired refrain that the question of its liability to a consumer lawsuit has been decided for all time—and in all cases involving CPU defects—because it prevailed on a motion to dismiss in a prior MDL. Mot. at 13-14. Specifically, Intel contends that the defect here is not central to the functionality of its products because a CPU's central functionality is supposedly to "process instructions." *Id.* at 14. As an initial matter, Intel's argument is nonsensical—if Intel's interpretation of the test is accepted, it would be impossible for Intel to commit fraud if its CPUs can process a single instruction. Moreover, Intel pretends to find support for this bizarre argument for immunity in the Spectre and Meltdown litigation, but fails to tell the Court what the Ninth Circuit said about the allegations there (in an unpublished opinion):

> There is **no allegation** that Plaintiffs' processors ever stopped operating as "the 'brains' of the computing device[s], performing all necessary computations for each application . . . and each peripheral." Although the processors' level of security may well be material to customers, the security risk presented by the defects

> alleged in this case does not make these defects central to the processors' function.

*In re Intel Corp. CPU Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2023 WL 7211394, at *1 (emphasis added). As explained above, Plaintiffs here plausibly allege precisely what the Ninth Circuit said was missing in the pleadings in the Spectre and Meltdown litigation—that the CPUs Intel sold Plaintiffs are defective because they do not operate as "the brains" of the computing device and do not perform "all necessary computations for each application" and for "each peripheral." Moreover, contrary to Intel's mischaracterization of the pleaded facts, Plaintiffs do not allege a hypothetical security vulnerability, nor merely a performance decline in Affected CPUs. Mot. at 13-15. To the extent Intel contends that the Court can short-circuit the material factual question and decide the question as a matter of law on a motion to dismiss in the face of particularized allegations, there is no binding precedent suggesting any such thing. Likewise, Intel's suggestion that Plaintiffs must stop using their computers to meet the central functionality test is without any legal support. Intel does not cite a single Ninth Circuit decision that stands for such a proposition. Indeed, that argument is inconsistent with the allegations here that the CPUs were unmerchantable at the time of sale. *See* § IV.A, *infra*.

**_LiMandri_ Factors.** Plaintiffs must allege facts that satisfy one of the *LiMandri* factors. The CAC satisfies several. A Defendant has a duty to disclose "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *LiMandri*, 52 Cal. App. 4th at 336 (cleaned up). As explained above in section I.A.1, *supra*, the CAC alleges that Intel had exclusive knowledge of the omitted defect and that it actively concealed the defect, including by keeping the AVX buffers and other CPU components secret. In addition, Intel repeatedly represented that it had redesigned its products to eliminate the speculative execution defects it was alerted to from the Spectre/Meltdown defect, particularly as to its 8th generation of CPUs. *Id.* ¶¶ 10, 126-27 (Intel CEO Brian Krzanich promising hardware redesign); *see also id.* ¶¶ 133-34 (announcing redesigned architecture with new AVX instructions). Intel's partial

representations never disclosed that Intel had left a defect in the AVX instructions intact, nor did it disclose that it had not redesigned the AVX buffers that ultimately led to the Downfall exploit and associated defect. Indeed, Intel did not even disclose those buffers' existence. *Id.* ¶¶ 10, 12, 160.

### 3.     The CAC Pleads Reliance for Claims that Require It

Under California law, reliance can be inferred when it is "plausible that a reasonable man would attach importance to [the] existence or nonexistence [of the statements] in determining his choice of action in the transaction in question." *Belyea v. Greensky, Inc.*, 2021 WL 1338549, at *5 (N.D. Cal. Apr. 9, 2021). A plaintiff may plead reliance by pleading that "had the omitted information been disclosed, one would have been aware of it and behaved differently." *Taleshpour*, 2021 WL 1197494, at *11 (quoting *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (cleaned up)). The Kansas Consumer Protection Act, Illinois Consumer Fraud and Deceptive Business Practices Act, Oregon Unlawful Trade Practices Act, and Minnesota consumer fraud statutes do not require a showing of reliance. *See Hernandez v. Pistotnik*, 58 Kan. App. 2d 501, 506 (2020) (Kansas CPA); *In re Roundup Prod. Liab. Litig.*, 2023 WL 2723334, at *4 (N.D. Cal. 2023) (quoting *Thacker v. Menard, Inc.*, 105 F.3d 382, 386 (7th Cir. 1997)) (Illinois CFDBPA); *Wolverton v. Stanwood*, 565 P.2d 755, 757 (Or. 1977) (Oregon UTPA)); *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 12 (Minn. 2001). Moreover, each Plaintiff states that they would not have purchased at the price they had paid if they had known about the defect. CAC ¶¶ 24 (Smith); 28 (Waltrip); 32 (Cameron); 36 (Cordova); 41 (Worley). Plaintiffs also conducted two precomplaint conjoint studies that confirmed a material difference in consumers' marginal-willingness-to-pay. *Id.* at 225. Intel's assertion that the CAC pleads "no facts" on this issue is simply false.

### 4.     Plaintiffs State Fraud Claims under the Fraud Prong of the UCL

Contrary to Intel's suggestion that dismissal of a common law fraud claim necessitates the dismissal of a UCL fraudulent prong claim, the California Supreme Court has held these claims are "understood to be distinct from common law fraud." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009). While "common law fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages[, n]one of these elements are required to state a claim for injunctive relief under the UCL." *Id.* (cleaned up). Intel has made

no arguments as to why Plaintiffs' UCL fraud-prong claim fails, other than asserting that it fails for the same reasons as Plaintiffs' common law fraud claims.

### B.      The CAC Plausibly Pleads FAL and CLRA Claims

Plaintiffs have plausibly alleged claims under the California False Advertising Law. An FAL claim is adequately pleaded where the complaint identifies "an affirmative statement that was made false or misleading by the omission of relevant and material information." *Kulp v. Munchkin, Inc.*, 2023 WL 4843340, at \*7 (C.D. Cal. 2023). Whether an advertisement is misleading is determined by asking whether a reasonable consumer would likely be deceived. *Hodsdon*, 891 F.3d at 867-68. The California Supreme Court has recognized "that these laws prohibit not only advertising, which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (cleaned up). This inquiry is "usually be a question of fact not appropriate for decision on" motions to dismiss. *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1017 (9th Cir. 2020). Intel's suggestion that an FAL claim requires an affirmative misrepresentation is simply wrong. Plaintiffs' CLRA claims are also adequately pleaded based on Intel's fraudulent omission. *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 996 (N.D. Cal. 2013) (CLRA "encompass[es] both representations, per the explicit text of the statute, as well as omissions").

## II.      PLAINTIFFS HAVE ADEQUATELY PLEADED A CLAIM UNDER THE UNFAIR PRONG OF THE UCL

What constitutes unfair practices under the UCL is unsettled, *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104 (N.D. Cal. 2017), but the Ninth Circuit has accepted two tests pending resolution by the California Supreme Court, *Mier v. CVS Pharmacy, Inc.*, 2021 WL 1559367, at \*6 (C.D. Cal. 2021). Plaintiffs assert their UCL unfair claim only under the balancing test, which requires that a challenged practice's impact on the victim outweigh "the reasons, justifications and motives of the alleged wrongdoer," *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1215 (9th Cir. 2020) (cleaned up). The CAC comfortably states an unfair claim based on this balancing test.

To begin with, the CAC alleges that the Affected CPUs were defective when sold, particularly because the speculative execution, cache memory, and segmentation systems in the

processors' AVX instruction set were defectively designed—and Intel knew they were. The CAC alleges that the Spectre and Meltdown flaw had alerted Intel to a defect requiring redesign. Intel did not, however, implement such a redesign, opting instead to employ a plainly unfair sales tactic. That is, Intel marketed and sold CPUs without basic safety guardrails the company knew were needed, in order to mask that these CPUs could not perform as saleable, modern CPUs. Intel knew from its Spectre/Meltdown mitigation efforts that if the AVX-related defect was discovered, a mitigation would substantially impair the performance and functionality of Affected CPUs. Put simply, Intel sold CPUs that did not meet basic functional requirements for modern CPUs, but masked this fact by simply hiding secret buffers and other CPU components that would allow the company's defective design to be eventually exploited. Intel did this masking to avoid having to sell its CPUs with mitigations that would massively impair their performance and disable central functionality required for CPU input-output, memory caching, and encryption-related computation and storage.

Intel's arguments concerning the UCL unfair prong incorrectly dismember Intel's conduct and attack each aspect of the company's unfair practices in isolation. For example, Intel points to allegations it knew about the defect when it sold CPUs and argues that such allegations are merely fraud allegations repeated. Mot. at 18. Not so. The CAC alleges not only that Intel knew about the defect, but that it sold its CPUs without mitigations so that it could sell its CPUs at a premium as commercially competitive. Intel's decision to sell CPUs without the necessary mitigations to make them safe against a known vulnerability was an unfair practice—a practice distinct from Intel's fraudulent omission (discussed at § I.A, *supra*). *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 942, 1018 (N.D. Cal. 2018) (undisclosed "defeat device" can be unfair practice under Illinois consumer protection law without intent to deceive). The cost-benefit analysis required to weigh this conduct under the UCL is not appropriate for resolution on a motion to dismiss. *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1117 (N.D. Cal. 2015) ("Plaintiffs have adequately alleged conduct (interception and transmission of private and confidential communications and data) that plausibly could outweigh the utility of such conduct to Defendants. The cost-benefit analysis this test calls for is not properly suited for resolution at the pleading stage."). Intel invites error by asking the Court to short-circuit this factual inquiry.

Intel argues that impaired performance from the Downfall mitigations is insufficient to assert an unfair claim. Here too, Intel makes its forever-immunity argument based on the Spectre/Meltdown litigation. Intel fails to acknowledge that unlike there, where Intel did not know about the alleged defect and also did not know that the defect would result in crippling mitigations, Intel here ***knew*** that selling its CPUs with mitigations would diminish performance such that the CPUs would no longer be commercially competitive. The Spectre/Meltdown defect is precisely what made it clear to Intel that it was selling commercially inviable CPUs after 2018. Intel argues that the mitigations are "not the defect," Mot. at 20, but after Spectre and Meltdown, selling CPUs without mitigations plainly rendered them defective at the point of sale. Intel's knowing failure to sell its CPUs with necessary mitigations was conduct that harmed consumers, and the only reason for the conduct was to prevent customers from learning that Intel's CPUs were not commercially competitive. *See* CAC ¶ 331 (Intel's decision not to address defect not justifiable under balancing test). The question of Intel's motivations for selling unmitigated CPUs also makes balancing under the UCL highly factual and inappropriate for resolution on a motion to dismiss. *In re MacBook Keyboard Litig.*, 2019 WL 1765817, at *9 (N.D. Cal. Apr. 22, 2019) ("The balancing test required by the unfair business practice prong of section 17200 is fact intensive and is not conducive to resolution at the motion to dismiss phase. . . . Without a factual record as to Apple's justifications and motives for its alleged conduct and to that conduct's alleged impact on Plaintiffs, the Court cannot determine the outcome of the balancing test." (cleaned up)).

Moreover, the fact that Intel's conduct also constitutes a fraudulent omission is not a basis for dismissal. Contrary to Intel's intimations, the Ninth Circuit was clear that the Spectre and Meltdown plaintiffs failed to allege an unfair practice based on Intel's knowledge because they did not successfully allege a fraudulent omission. *In re Intel Corp. CPU Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2023 WL 7211394, at *2. As the Ninth Circuit explained about the Spectre/Meltdown complaint, "[a]ny allegations that Intel sold its processors while knowing them to be defective is simply another way of advancing Plaintiffs' fraud-by-omission argument, which, as discussed above, ***was not well pleaded***. As Intel was under no duty to disclose the defects, this conduct cannot have been 'substantially injurious' for purposes of an unfair conduct claim." *Id.* (emphasis added).

As explained above, section I.A, *supra*, Plaintiffs allege a fraudulent omission with particularity, including based on facts nowhere alleged in the Spectre and Meltdown litigation.

## III. PLAINTIFFS HAVE ADEQUATELY PLEADED A CLAIM UNDER THE ULAWFUL PRONG OF THE UCL

"A violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong." *Moran v. Prime Healthcare Mgmt., Inc.*, 3 Cal. App. 5th 1131, 1142 (2016) (*citing Berryman v. Merit Property Management, Inc.*, 152 Cal. App. 4th 1544, 1554 (2007)). Plaintiffs plausibly allege fraud, violations of the FAL and CRLA, and breaches of implied warranties, thus also stating a claim under the unlawful prong. Plaintiffs can further plead the unlawful prong of the UCL through their unjust enrichment/quasi-contract claims. *Best Carpet Values, Inc. v. Google LLC*, 2021 WL 4355337, at *9–10 (N.D. Cal. Sept. 24, 2021).

## IV. PLAINTIFFS HAVE STATED IMPLIED WARRANTY CLAIMS

Counts Seven, Eight, Thirteen, and Sixteen plead implied warranty claims on behalf of those Plaintiffs that purchased Intel CPUs (rather than computers containing Intel CPUs). *See* CAC ¶¶ 410-24 (California implied warranty under Cal. Comm. Code § 2314), 425-42 (California implied warranty under Song-Beverly Act, Cal. Civ. Code § 1790 *et seq.*), 491-505 (Kansas implied warranty under Kan. Stat. Ann. § 84-2-314), 526-40 (Illinois implied warranty). Each of these claims is adequately pleaded.

### A. Intel's CPUs Are Unmerchantable

The CAC includes detailed allegations that Intel breached its implied warranty by selling CPUs that are unmerchantable. The implied warranty of merchantability is breached when a product is so defective that it lacks "even the most basic degree of fitness for ordinary use." *Birdsong v. Apple, Inc.*, 590 F.3d 955, 958 (9th Cir. 2009) (cleaned up). Here, Intel designed its Affected CPUs in such a way that they are unmerchantable both as sold and as patched. *See, e.g.,* CAC ¶¶ 3, 17, 196-220, 331. As explained in the Sections III and IV of the CAC (¶¶ 182-95 and 196-220), the systems at the heart of the Downfall exploit and its patch, including Intel's AVX vector instructions, enable functionality central to ordinary and expected use of a modern CPU. *See id.* ¶¶ 196-220. The design defect in Intel's Affected CPUs render these instructions, and the secret buffers and execution

systems associated with them, so vulnerable to catastrophic exploitation that Intel has forced patches that essentially disable vector processing, cutting CPU performance by as much as 50% in everyday tasks like gaming, photo and video editing, and encryption operations used for secure networking, secure communication, and secure data storage. *Id.* ¶¶ 194-95, 203; *see generally* 196-220. A precomplaint conjoint showed a massive loss in product value to consumers from the security vulnerability (median computer with Affected Intel CPU loses 85% of value, *id.* ¶ 229) and from the performance-impairing mitigation (media computer with Affected Intel CPU loses 58% of value, *id.* ¶ 230) associated with the design defect in Affected Intel CPUs, *id.* ¶¶ 223-39. Each named Plaintiff that purchased an Affected Intel CPU has been substantially impacted. *See* ¶¶ 27, 31.

These allegations plainly meet the requirement for pleading unmerchantability—that, "although capable of performing its ordinary function, the product nonetheless fails in a significant way to perform as a reasonable consumer would expect." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1109 (N.D. Cal. 2015); *see also In re Nexus 6P Prod. Liab. Litig.* ("*Nexus 6P*"), 293 F. Supp. 3d 888, 925 (N.D. Cal. 2018). Intel cannot simply redefine the product's "core functionality" to "reduce a product to its most basic, bare minimum purpose," but must take into account "a commonsense view informed by reasonable consumers' expectations about the function of the type of product in a general sense." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1109-10 (N.D. Cal. 2015); *Day v. Advanced Micro Devices, Inc.*, 2023 WL 6998188, at *1 (N.D. Cal. Oct. 23, 2023) (same). *See also Corzine v. Whirlpool Corp.*, 2016 WL 6476172, at *3-4 (N.D. Cal. Nov. 2, 2016) (refrigerator's purpose not limited to "keeping food cold"); *Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 26-27 (2007) (defective automobile not merchantable simply because it "provides transportation from point A to point B"); *Lessin v. Ford Motor Co.*, 2020 WL 6544705, at *7 (S.D. Cal. Nov. 6, 2020) (relying on *Isip v. Mercedes-Benz* to hold that "[th]e ordinary purpose of a car is not simply to provide transportation but rather, safe and reliable transportation."); *Becerra v. Gen. Motors LLC*, 241 F. Supp. 3d 1094, 1114 (S.D. Cal. 2017); *Albrosco Ltd. v. Prince Agri Prods., Inc.*, 545 F. Supp. 3d 656, 663-64 (C.D. Ill. 2021); *McLellan v. Fitbit, Inc.*, 2018 WL 2688781, at *4 (N.D. Cal. Jun. 5, 2018); *Hauter v. Zogarts*, 14 Cal. 3d 104, 118 (1975).

Plaintiffs' implied warranty allegations also distinguish this case from previous CPU cases. The court in *In re Intel Corp. CPU Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2020 WL 1495304 (D. Or. Mar. 27, 2020), relied on the fact that plaintiffs had not pleaded "that the allegedly defective CPUs corrupt data, freeze the computer, *or render the computers unable to process commands or run programs*." *Id*. at *13 (emphasis added). The court further relied on plaintiffs' failure to assert "that the alleged defects otherwise affect *the computing itself*." *Id*. (emphasis added). To the contrary, Plaintiffs here have sufficiently pleaded that the defect in Intel's AVX instructions and associated execution systems renders computers unable to properly process commands or run programs, through both the security vulnerability itself and its performance-diminishing "mitigation," *see* CAC ¶¶ 154-81 (Downfall exploit), 182-95 (details of mitigation), 196-220 (ordinary expectations), 223-39 (conjoint analysis). Indeed, the CAC includes allegations based on industry participants, *id.* ¶¶ 113-95, Intel's own marketing,[3] *id.* ¶¶ 196-220, Plaintiffs' expectations and experiences with the defective products,[4] *see, e.g., id.* ¶¶ 22-24, 26-28, 30-32, 35-36, and surveys and statistical analysis, *see id.* ¶¶ 224-39. This is far from the "no allegations" pleaded on the subject in the Spectre and Meltdown litigation.

### B. Intel's Privity Arguments Are Meritless

Intel argues that the implied warranty claims under the California Commercial Code and Illinois law fail for lack of vertical privity, and that the third-party beneficiary exception is unavailable in those jurisdictions. Mot. at 24. Not so. The third-party beneficiary exception to

---

[3] Intel's marketing statements, *see, e.g.,* CAC ¶¶ 196-200, inform the court's analysis of what is deemed a product's ordinary purpose. *See McLellan*, 2018 WL 2688781, at *4 (relying on marketing for ordinary purpose analysis); *Hauter*, 14 Cal. 3d at 118 (golf training device unfit for "particular class of golfers" designed for and marketed to). Moreover, Intel's arguments about merchantability invite a factual inquiry, not suitable for resolution on a motion to dismiss. *See Pisano v. Am. Leasing*, 146 Cal. App. 3d 194, 198 (1983) (inquiry is a "question of fact"); *see also Shoop v. DaimlerChrysler Corp.*, 371 Ill. App. 3d 1058, 1065-66 (2007) (same); *Arabian v. Organic Candy Factory*, 2018 WL 1406608, at *8 (C.D. Cal. Mar. 19, 2018) (same).

[4] Despite Intel's claim to the contrary, Courts have repeatedly rejected the argument that a defect must be so severe as to preclude Plaintiffs' continued use. *See, e.g., In re Carrier IQ, Inc.*, 78 F. Supp. 3d at 1110; *Stearns v. Select Comfort Retail Corp*, 2009 WL 1635931, at *8 (N.D. Cal. Jun. 5, 2009); *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 946-47 (N.D. Cal. 2018).

vertical privity is recognized under California and Illinois law.[5] *See Bagel v. Am. Honda Motor Co.*, 132 Ill. App. 3d 82, 88-89 (1985); *Gilbert Fin. Corp. v. Steelform Contracting Co.*, 82 Cal. App. 3d 65, 69-70 (1978). That is, "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time . . . ." Cal. Civ. Code § 1559. Such a contract does not need to expressly name a third party as a beneficiary, but must more than incidentally benefit that third party to satisfy the exception. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1184 (C.D. Cal. 2010). The CAC sufficiently alleges the existence of a contract involving Intel for which Plaintiffs are third-party beneficiaries. *See* CAC ¶¶ 422, 440, 503, 538; *Nexus 6P*, 293 F. Supp. 3d at 923 (retailers were not intended to be ultimate consumers and had no rights under warranty agreements, which were intended for end-users); *In re MyFord Touch Cons. Litig.*, 46 F. Supp. 3d 936, 982 n.15 (N.D. Cal. 2014) (car "dealers were not intended to be the ultimate consumers . . . and have no rights under the warranty agreements").

Further, the *Clemens*[6] decision (which the *Mandani*[7] decision that Intel cites for this proposition heavily relies on) is inapposite. *Clemens* does not discuss or even mention the "third-party beneficiary" exception. *See Clemens*, 534 F.3d 1017; *In re MyFord Touch Cons. Litig.*, 46 F. Supp. 3d at 984 (discussing *Clemens*). As a result, there is a split within the Circuit—and even within this District—as to whether *Clemens* precludes this exception under California law. *See In re Natera Prenatal Testing Litig.*, 2023 WL 3370737, at *9 (N.D. Cal. Mar. 28, 2023) (collecting cases). As the majority of courts have recognized, "the broad language regarding the scope of this exception in *Gilbert*—which was not directly addressed in *Clemens*—renders the exception available to Plaintiffs here." *Natera*, 2023 WL 3370737, at *9 (citing *Gilbert*, 82 Cal. App. 3d at 70); *see also Day v. Advanced Micro Devices, Inc.*, 2023 WL 6998188, at *1 (N.D. Cal. Oct. 23, 2023) (same); *In re MyFord Touch Cons. Litig.*, 46 F. Supp. 3d at 984 ("this Court does not read *Clemens* . . . as foreclosing the third-party beneficiary exception").

---

[5] Note that although Intel did not raise the issue in its brief, implied warranty of merchantability claims under California's Song-Beverly Act do not require privity. *See Mega RV Corp. v. HWH Corp.*, 225 Cal. App. 4th 1318, 1333 n.11 (2014).

[6] *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008).

[7] *Mandani v. Volkswagen Grp. Of Am., Inc.*, 2019 WL 652867 (N.D. Cal. Feb. 15, 2019).

Additionally, Plaintiffs have also alleged facts to plead viable exceptions to privity under Illinois law. At least two exceptions exist to the privity rule for implied warranty under Illinois law: 1) the "direct dealings" or "direct relationship" exception, and 2) the third-party beneficiary exception that applies "where the manufacturer knew the identity, purpose and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements." *Elward v. Electrolux Home Prod., Inc.*, 214 F. Supp. 3d 701, 704-06 (N.D. Ill. 2016). Moreover, "the law is not as limited as Defendant believes," *Villanueva v. Am. Honda Motor Co.*, 2019 WL 8112467, at \*9 (C.D. Cal. Oct. 10, 2019), as to those exceptions. Courts applying Illinois law have held sufficient allegations that "Defendant was aware that 'remote customers' generally expected the product to meet minimum standards." *Id.*; *see Elward v. Electrolux Home Prod., Inc.*, 214 F. Supp. 3d 701, 706 (N.D. Ill. 2016) (holding sufficient allegations "that [Defendant] was aware of remote customers' requirement that their dishwashers function without overheating, catching fire, and causing floods."); *Sheeley v. Wilson Sporting Goods Co.*, 2017 WL 5517352, at \*3 (N.D. Ill. Nov. 17, 2017) (holding sufficient allegations that defendant "was aware of remote customers' requirement that its bats comply with USSSA regulations and that [defendant] delivered bats in order to satisfy that requirement"). Plaintiffs have alleged facts to that effect. *See* CAC ¶ 205 ("Intel understands that these applications are central to the function of its processors.); ¶ 207 ("Intel understands that performance, including as to vector processing applications, is one of the most important, if not central, aspects of a CPU."); ¶ 532 ("Intel knew or had reason to know of the specific use for which the Affected CPUs were purchased.").

Courts have likewise held sufficient allegations that defendant "advertised their products . . . not only in their packaging and labeling but also on their website and in a long-standing market campaign targeted directly at consumers and [where] Plaintiffs relied on these statements in deciding to purchase the [products]." *Leppert v. Champion Petfoods USA Inc.*, 2019 WL 216616, at \*9 (N.D. Ill. Jan. 16, 2019); *In re Rust-Oleum Restore Mktg., Sales Pracs. & Prod. Liab. Litig.*, 155 F. Supp. 3d 772, 807 (N.D. Ill. 2016) (allegations that defendant ran "direct marketing campaign to consumers" and plaintiffs "relied upon Defendant's misrepresentations regarding [product]" were sufficient at pleading stage). Here too, Plaintiffs have alleged as much. *See* CAC ¶ 209 ("Intel makes

clear, through its own statements including those marketing to CPU and computer purchasers, that gaming and AI applications . . . lie at the heart of a modern CPU's value and functionality. If Intel's CPUs did not permit a computer built around them to perform these tasks, Intel's CPUs would not be acceptable to the ordinary consumer and would fall far short of industry standards."); 530 ("Intel marketed the Affected CPUs as having high quality, speed, performance, and security, that would function, at least, as reasonably expected by consumers and in accordance with industry standards. Intel's representations formed the basis of the bargain in Plaintiff Cameron and the Illinois Class Members' decisions to purchase the Affected CPUs.").

### C.     Intel's California Transaction Arguments Are Inapplicable

Intel argues that Plaintiffs' California Song-Beverly Act claim "fails because Plaintiffs do not plead that they purchased their devices in California." Motion at 24-25. This argument is inapplicable because Intel is simply wrong: Plaintiffs have indeed pleaded that Plaintiffs Cameron and Waltrip—who are the only Named Plaintiffs that bring a claim under the Song-Beverly Act[8]— "purchased their Affected CPUs at retail in California within the meaning of Cal. Civ. Code § 1792." CAC ¶ 430. This allegation is sufficient at the pleading stage.[9] *See, e.g., In re Seagate Tech. LLC Litig.*, 2017 WL 3670779, at *16 (N.D. Cal. Aug. 25, 2017); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1107 (N.D. Cal. 2015).

## V.     PLAINTIFFS STATE QUASI-CONTRACT AND UNJUST ENRICHMENT CLAIMS

Counts Five. Nine, Twelve, Fifteen, and Nineteen of the CAC plead—and state—claims for quasi-contract/restitution or unjust enrichment under the laws of California, Oregon, Kansas, Illinois, and Minnesota, respectively. *See* CAC ¶¶ 387-97 (California quasi-contract/restitution), 443-54 (Oregon unjust enrichment), 479-90 (Kansas unjust enrichment), 515-25 (Illinois unjust

---

[8] *See* CAC ¶¶ 425-42.

[9] Moreover, the CAC also alleges that "Intel is headquartered in California and directs its United States Sales and shipping operations from California, including with respect to the Affected CPUs purchased by Plaintiffs Cameron and Waltrip and the Nationwide CPU Purchaser Class Members." CAC ¶ 430. "[A] consumer good that is sold and shipped from California to another state pursuant to a shipment contract is 'sold in California' for purposes of the Song-Beverly Act[.]" *Gusse v. Damon Corp.*, 470 F. Supp. 2d 1110, 1115 (C.D. Cal. 2007); *see California State Elecs. Assn. v. Zeos Internat. Ltd.*, 41 Cal. App. 4th 1270, 1275 (1996).

1    enrichment), 574-84 (Minnesota unjust enrichment). The elements of a claim for quasi-

2    contract/restitution or unjust enrichment are (1) a defendant's receipt of a benefit and (2) unjust

3    retention of that benefit at the plaintiff's expense. *See MH Pillars Ltd. v. Realini*, 277 F. Supp. 3d

4    1077, 1094 (N.D. Cal. 2017) (citing *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593

5    (2008)); *Larisa's Home Care, LLC v. Nichols-Shields*, 404 P.3d 912, 918-21 (Or. 2017); *Bruger v.

6    Olero, Inc.*, 2023 WL 6290090, at *5 (N.D. Ill. 2023) (citing *HPI Health Care Servs., Inc. v. Mt.

7    Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)); *John Michael Assocs., Inc. v. BlueStem Mgmt.

8    Advisors LLC*, 2023 WL 5379569, at *5 (D. Kan. 2023) (citing *Haz-Mat Response, Inc. v. Certified

9    Waste Servs. Ltd.*, 910 P.2d 839, 847 (Kan. 1996)); *In re Pork Antitrust Litig.*, 495 F. Supp., 3d 753,

10   791 (D. Minn. 2020) (citing *Klass v. Twin City Fed. Sav. & Loan Ass'n*, 291 Minn. 68, 190 N.W.

11   2d 493, 494–95 (1971)).

12        As explained above in connection with the "unfair" prong of the UCL, Intel sold processors

13   knowing that they contained a particular type of security vulnerability and knowing that, absent

14   actual reengineering (which Intel promised but did not actually do), "patching" this security

15   vulnerability would kneecap the processors' everyday performance—the functional equivalent of

16   an unmerchantably restrictive speed governor. Intel knew this, as explained earlier, because it was

17   specifically told of speculative execution vulnerabilities in its AVX instruction set in 2018, CAC

18   ¶¶ 130-53, and knew from its experience with Spectre and Meltdown that "patching" a speculative

19   execution vulnerability without reengineering hardware would entail a significant performance

20   impact, *id.* ¶¶ 112-29, 182-95. Given these facts, Intel sold Affected CPUs *knowing* that they were

21   not actually as advertised and expected: Intel's chips were knowingly and deceptively portrayed and

22   initially experienced as saleable solely because the company had declined to implement reasonable

23   security safeguards against known risks in producing them. That is, Intel's Affected CPUs were

24   knowingly designed and marketed to have exaggerated performance at point-of-sale, while Intel's

25   experiences in 2018 (when the company received multiple vulnerability reports regarding its AVX

26   instructions and learned from its Spectre and Meltdown experience that "patching" a speculative

27   execution vulnerability without reengineering hardware entailed substantial performance costs)

28   unquestionably gave the company knowledge that these initial performance specifications were but

a façade, which would fall away once the company's AVX instructions and secret buffers were publicly exploited.

And this is exactly what happened. After Spectre and Meltdown, Intel marketed, distributed, and sold CPUs that it *knew* had devastatingly exploitable vulnerabilities, and that it *knew* would be unmerchantably slowed if "patched" without reengineering. However, for reasons not yet known to Plaintiffs (perhaps to increase company profits), Intel did not reengineer its CPUs to protect its AVX instructions after Spectre and Meltdown, or after twin vulnerability reports in 2018 about those instructions—and indeed maintained secret buffers that allowed a speculative execution attack on the AVX instruction set to imperil the most valuable secrets on a computer, including AES keys used in secure networking and hard disk encryption. And moreover, Intel sold these unfixed, vulnerable chips (chips that Intel *knew* would face a substantial performance degradation to patch when their known AVX vulnerabilities were exploited) with no discount or disclosure to account for their actual, degraded performance expectancy. When, in 2022, Intel faced the reality of a soon-to-be public, unusually devastating exploit of its AVX instruction set and secret buffers, the company did what it knew several years earlier it would have to do eventually—it issued a "patch" that effectively disabled AVX execution functionality and, in doing so, degraded the performance of its CPUs by up to 50% on everyday tasks.

In short, Affected Intel CPUs, and computers built around them, were actually worth substantially less than the price they were sold for—if anything at all. And Intel knew as much (the Affected CPUs were unreasonably insecure, and this insecurity was the only reason they performed at merchantable levels when initially sold), and it knew why (Intel's AVX instruction set and its secret buffers was uniquely vulnerable to devastating speculative execution attacks, and Intel knowingly declined to fix it). Intel received a premium for selling Affected CPUs as something other than what they actually were, and it has to this day retained such premium. At the same time, Plaintiffs, who bought Affected CPUs or computers built around Affected Intel CPUs, unfairly paid such a premium. This is the essence of a claim for unjust enrichment or quasi-contract/restitution, under California, Oregon, Illinois, Minnesota, or Kansas law. Nothing in Intel's motion—which largely ignores the foregoing allegations and declines to inform the Court that the Ninth Circuit

1  never even passed upon unjust enrichment or quasi-contract claims in the Intel Spectre/Meltdown

2  cases, *see* 2023 WL 7211394,—is to the contrary.[10]

3  ## VI.   PLAINTIFFS HAVE ADEQUATELY PLEADED A NEGLIGENCE CLAIM

4       Plaintiffs have adequately pleaded their negligence claims. CAC ¶¶ 398-409 (Count Six).

5  Plaintiffs asserted negligence claims solely for the harm to their PCs—not for any injury or damage

6  to the Intel CPUs themselves. Intel argues that these claims are barred by the economic loss doctrine.

7  Mot. at 22. Not so. Although the "economic loss doctrine precludes recovery against a manufacturer

8  for physical damage that the manufacturer's defective product causes to the 'product itself,'"

9  *CHMM, LLC v. Freeman Marine Equip., Inc.*, 791 F.3d 1059, 1061 (9th Cir. 2015) (citing *E. River*

10 *S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 866-71 (1986)), it does not bar claims for

11 injury to other property (here, Plaintiffs' PCs). Indeed, damage to "property other than the product

12 itself" does not constitute economic loss, and thus is not barred by the economic loss doctrine. *See*

13 *Kalitta Air, L.L.C. v. Cent. Tex. Airborne Sys., Inc.*, 315 F. App'x 603, 605 (9th Cir. 2008); *NuCal*

14 *Foods, Inc. v. Quality Egg LLC*, 918 F. Supp. 2d 1023, 1029 (E.D. Cal. 2013) ("If plaintiff has

15

16  _____

17 [10] Both the *Apple* and *Vallarta* cases cited by Intel pertain to unjust enrichment claims alleged and
argued coextensively with fraud claims. *See In re Apple Processor Litig.*, 2022 WL 2064975, at *12
18 (N.D. Cal. Jun. 8, 2022) ("the formulation of Plaintiffs' unjust enrichment claim relies on the same
set of allegations as Plaintiffs' Fraud Claims addressed above"); *Vallarta v. United Airlines, Inc.*,
19 497 F. Supp. 3d 790, 810 (N.D. Cal. 2020) (unjust enrichment claim was premised on fraud and
illegality, and Plaintiffs had not adequately alleged either). Plaintiffs' fraud-based claims are
20 adequately pleaded, as explained earlier in this brief, and the quasi-contract/unjust enrichment
claims stand for that additional reason. But as explained in this subsection, Plaintiffs' quasi-
21 contract/unjust enrichment claims are well-pleaded irrespective of the Court's ruling on Plaintiffs'
fraud-based claims.
22      As to Intel's citation to *In re Intel Corp. CPU Marketing, Sales Practices and Prods. Liab.*
*Litig.*, 614 F. Supp. 3d 783 (D. Or. 2022), there the Court held:
23

24       Plaintiffs are asserting only that Intel was unjustly enriched because
         the seven remaining Named Plaintiffs purchased devices with Intel
25       chips during an embargo period without knowing about the
         embargoed security vulnerabilities while Intel knew about them. As
26       discussed above, this describes a "normal" embargo situation and
         thus is an insufficient basis to state a claim of unjust enrichment.
27

28 *Id.* at 795. That holding—to the extent there was one—is clearly factually distinguishable from the
quasi-contract/unjust enrichment theory here.

1   sufficiently alleged damaged to property other than [the product at issue here], then the economic

2   loss rule does not apply."); *Baker v. Nutrien Ag Sols., Inc.*, 2022 WL 3142065, at *11 (E.D. Cal.

3   Aug. 5, 2022) ("In short, the 'other property' exception to the economic loss rule applies to property

4   damages beyond the scope of the underlying transaction."); *Mars, Inc. v. Heritage Builders of*

5   *Effingham, Inc.*, 327 Ill. App. 3d 346, 354 (2002) (recognizing and applying the "other property"

6   exception under Illinois law); *Star Furniture Co. v. Pulaski Furniture Co.*, 171 W. Va. 79, 82 (1982)

7   ("In this jurisdiction, plaintiffs may utilize a strict liability cause of action to recover for damage to

8   property other than the defective product. This is the unanimous view in other jurisdictions.").

9          Here, Plaintiffs allege that the defect caused physical damage to the PCs and laptops in which

10  the Affected CPUs run. *See* CAC ¶¶ 243-48. For example, the CAC explains that "a 'mitigated'

11  CPU affected by Downfall now must use more electricity and generate more heat, longer, to process

12  the same amount of instructions and data that it did before Intel's mitigation," *id.* ¶ 243, citing

13  distinct power-to-performance signatures and explaining that "[a]fter mitigation, t[he Affected

14  CPUs'] power profile is significantly different. CPUs will have to run longer, hotter, and slower to

15  accomplish the same task at peak power levels," *id.* ¶¶ 244-45. "The defect's necessary 'mitigation'

16  also causes additional physical wear on the CPU and on batteries in battery-powered computers,

17  such as laptops, reducing the life of the battery," *id.* ¶ 246, and "operating CPUs for longer and

18  hotter diminishes the expected life of the CPU," *id.* ¶ 247; *see also id.* ¶ 248. The CAC alleges that

19  "[t]he physical wear on Plaintiffs Cameron, Cordova, Smith, Waltrip, and Worley and the

20  Nationwide CPU Purchaser and Nationwide Computer Purchaser Class Members computers

21  includes diminished battery life (for laptops) and (for all computers) a diminished expected life for

22  the CPU and nearby components due the CPU running for longer and at hotter temperatures." *Id.*

23  ¶ 408. The CAC is clear that this physical injury to Plaintiffs' computer was a "direct and

24  foreseeable consequence of Intel's defective design of the Affected CPUs." *Id.* These allegations of

25  physical injury to other property are sufficient to allege the exception to the economic loss rule. *See*

26  *In re NVIDIA GPU Litigation*, 2009 WL 4020104, at *12 (N.D. Cal. 2009) ("The Court finds that

27  Plaintiffs have adequately alleged that Defendant's defective product (the GPU) caused damage to

28  property such as the CPU's battery. Thus, Plaintiffs have alleged that the defective GPU has caused

damage to property other than itself."); *In re Lenovo Adware Litigation*, 2016 WL 6277245, at * 10 (N.D. Cal. 2016) (noting that harm to other property is not barred by economic loss doctrine); *see also Adirondack Combustion Techs., Inc. v. Unicontrol, Inc.*, 17 A.D.3d 825, 827 (N.Y. App. Div. 2005) (economic loss argument "flawed because defendant's product was the controller device, not the boiler, which sustained direct and consequential physical damage as a result of the 'puffback' explosion that occurred following the failure of defendant's product.").

Intel also argues, without any reference to the allegations in the CAC, that plaintiffs fail to allege a breach of the standard of care. The CAC, however, is replete with allegations that Intel's conduct fell far short of the standard of care. *See, e.g.*, CAC ¶¶ 130-53 (Intel warned about risks/defect and disregarded warnings); 171 (competitor AMD's CPUs not vulnerable).

## VII.   LEAVE TO AMEND

Should the Court dismiss any portion of the CAC, Plaintiffs respectfully request leave to amend, as any deficiencies can be cured. *See Schmitt v. Kaiser Found. Health Plan of Wash*., 965 F.3d 945, 960 (9th Cir. 2020).

### CONCLUSION

The Court should deny Intel's Motion to Dismiss.

DATED:  February 23, 2024

Respectfully submitted,


By:  */s/ Yavar Bathaee*
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
**BATHAEE DUNNE LLP**
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
**BATHAEE DUNNE LLP**
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
(213) 462-2772

*Attorneys for Plaintiffs and the Proposed Classes*