David S. Kurtzer-Ellenbogen (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
dkurtzer@wc.com
680 Maine Ave., S.W.
Washington, DC 20024
(202) 434-5000 / FAX (202) 434-5029

Charles H. Samel (SBN 182019)
Lauren V. Neuhaus (SBN 327698)
STOEL RIVES LLP
charles.samel@stoel.com
lauren.neuhaus@stoel.com
1 Montgomery Street, Suite 3230
San Francisco, CA 94104
(415) 617-8900 / FAX (415) 617-8907

*Attorneys for Defendant Intel Corporation*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| DARQUES SMITH, et al., | Civil Action No.  4:23-cv-05761-HSG |
| Plaintiffs, | **DEFENDANT INTEL CORPORATION'S REPLY IN SUPPORT OF MOTION TO DISMISS** |
| v. | |
| INTEL CORPORATION, | **[Fed. R. Civ. P. 9(b), 12(b)(6)]** |
| Defendant. | Complaint Filed: November 8, 2023 |
| | Date:   Thursday, May 2, 2024 |
| | Time:  2:00 pm |
| | Place:  Oakland Courthouse |
| | Courtroom 2, Fourth Floor |
| | Judge:  Hon. Haywood S. Gilliam, Jr. |

1

**TABLE OF CONTENTS**

2

INTRODUCTION ................................................................................................................1

3

I.      ALL OF THE FRAUD-BASED CLAIMS FAIL (Counts 1-4, 10-11, 14, 17-18). .............2

4

        A.      The Complaint Does Not Allege Any Affirmative Misrepresentation. ..................2

5

        B.      The Complaint Does Not Allege Any Actionable Omission. ................................2

6

                1.      Plaintiffs Do Not Plead a "Defect." ...........................................................2

7

                2.      The Omission Claims Fail Because Either the "Defect" Was Publicly
                        Known, or Intel Did Not Know of It. ..........................................................4

8

                3.      Plaintiffs Do Not Allege Any Duty To Disclose. .......................................5

9

                4.      Plaintiffs Do Not Plausibly Allege Reliance on Any Omission. ................9

10

II.     THE CLAIMS OF UNLAWFUL OR UNFAIR CONDUCT FAIL (Counts 2-3). ...........10

11

III.    THE IMPLIED WARRANTY CLAIMS FAIL (Counts 7, 8, 13, 16). ............................11

12

IV.     THE NEGLIGENCE CLAIM FAILS (Count 6). ...............................................................14

13

V.      THE QUASI-CONTRACT AND UNJUST ENRICHMENT CLAIMS FAIL
        (Counts 5, 9, 12, 15, 19).....................................................................................................15

14

15

VI.     THE OREGON UTPA CLAIM FAILS FOR ADDITIONAL REASONS (Count 10). ...15

16

VII.    COUNTS 11, 17, AND 18 ALSO FAIL BECAUSE THEY DO NOT
        PLEAD INTENT. ................................................................................................................15

17

18

CONCLUSION ................................................................................................................15

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Albrosco Ltd. v. Prince Agri Prods., Inc.*, 545 F. Sup. 3d 656 (C.D. Ill. 2021)...........................12

*Becerra v. Gen. Motors LLC*, 241 F. Supp. 3d 1094 (S.D. Cal. 2017) .........................................12

*Bradford v. L.A. Cnty. Off. of Educ.*, 2020 WL 6154284 (C.D. Cal. Aug. 19, 2020)........5, 11, 15

*Cho v. Hyundai Motor Co.*, 636 F. Supp. 3d 1149 (C.D. Cal. 2022)............................................13

*Clemens v. DamlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008)..............................................14

*Corzine v. Whirlpool Corp.*, 2016 WL 6476172 (N.D. Cal. Nov. 2, 2016)..................................12

*Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017 (N.D. Cal. 2012) ...................................................10

*Daniel v. Ford Motor Co.*, 806 F.3d 1217 (9th Cir. 2015) ............................................................9

*Day v. Advanced Micro Devices, Inc.*, 2023 WL 6998188 (N.D. Cal. Oct. 23, 2023) ................12

*Elward v. Electrolux Home Prods., Inc.*, 214 F. Supp. 3d 701 (N.D. Ill. 2016)..........................13

*Hauck v. Advanced Micro Devices, Inc.* ("*AMD I*"),

    2018 WL 5729234 (N.D. Cal. Oct. 29, 2018) ...................................................................11, 14

*Hauck v. Advanced Micro Devices, Inc.* ("*AMD II*"),

    2019 WL 1493356 (N.D. Cal. Apr. 4, 2019) ...........................................................................7

*Hauck v. Advanced Micro Devices, Inc.* ("*AMD III*"),

    816 F. App'x 39 (9th Cir. 2020) ............................................................................... *passim*

*Hills v. Arensdorf*, 543 F. Supp. 3d 1065 (D. Kan. 2021) ...........................................................10

*Hodsdon v. Mars, Inc.*, 891 F.3d 857 (9th Cir. 2018)........................................................6, 7, 10

*In re Apple Processor Litig.*, 2022 WL 2064975 ("*Apple II*") (N.D. Cal. June 8, 2022) ........3, 10

*In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051 (N.D. Cal. 2015) .....................................................12

*In re Intel Corp. CPU Mktg., Sales Pracs. & Prods. Liab. Litig.* ("*Intel I*"),

    2020 WL 1495304 (D. Or. Mar. 27, 2020) .....................................................................11, 12

*In re Intel Corp. CPU Mktg, Sales Pracs. & Prods. Liab. Litig.* ("*Intel II*"),

    2021 WL 1198299 (D. Or. Mar. 29, 2021) .........................................................................6, 15

*In re Intel Corp. CPU Mktg., Sales Pracs. & Prods. Liab. Litig.* ("*Intel III*"),

    582 F. Supp. 3d 771 (D. Or. 2022) .........................................................................................5

*In re Intel Corp. CPU Mktg., Sales Pracs. & Prods. Liab. Litig.* ("*Intel V*"),

   2023 WL 7211394 (9th Cir. Nov. 2, 2023)..................................................5, 7, 10

*In re Lenovo Adware Litig.*, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ..............................14

*In re My Ford Touch Consumer Litig.*, 46 F. Supp. 3d 936 (N.D. Cal. 2014)............................12

*In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888 (N.D. Cal. 2018) ................................12

*In re NVIDIA GPU Litig. Cases*, 2009 WL 4020104 (N.D. Cal. Nov. 19, 2009)........................14

*In re Seagate Tech. LLC Litig.*, 2017 WL 3670779 (N.D. Cal. Aug. 25, 2017) ........................14

*In re Sony Vaio Comput. Notebook Trackpad Litig.*,

   2010 WL 4262191 (S.D. Cal. Oct. 28, 2010) ............................................................14

*Johnson v. Nissan N. Am., Inc.*, 2018 WL 905850 (N.D. Cal. Feb. 15, 2018)............................13

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009)..........................................................2

*Lessin v. Ford Motor Co.*, 2020 WL 6544705 (S.D. Cal. Nov. 6, 2020)....................................12

*Mandani v. Volkswagen Grp. of Am., Inc.*, 2019 WL 652867 (N.D. Cal. Feb. 15, 2019) ...........13

*McCoy v. Nestle USA, Inc.*, 173 F. Supp. 3d 954 (N.D. Cal. 2016)..............................................2

*McLellan v. Fitbit, Inc.*, 2018 WL 2688781 (N.D. Cal. June 5, 2018) ..................................12, 13

*O'Shea v. Epson Am., Inc.*, 2011 WL 3299936 (C.D. Cal. July 29, 2011) ...................................2

*Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964 (N.D. Cal. 2008) ................................9, 15

*Redmon v. Whirlpool Corp.*, 2020 WL 9396529 (N.D. Ill. Apr. 28, 2020) ................................13

*Sanders v. Apple Inc.*, 672 F. Supp. 2d 978 (N.D. Cal. 2009) ....................................................15

*Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931 (N.D. Cal. June 5, 2009)...............13

*Trump Int'l Hotel & Tower v. Carrier Corp.*,

   524 F. Supp. 2d 302 (S.D.N.Y. 2007)......................................................................14

*Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. 2012)...............................................2, 5

**STATE CASES**

*Adirondack Combustion Techs., Inc. v. Unicontrol, Inc.*,

   793 N.Y.S.2d 576 (App. Div. 2005) ........................................................................14

*Am. Suzuki Motor Corp. v. Super. Ct.*, 37 Cal. App. 4th 1291 (1995)........................................12

*DeBouse v. Bayer*, 922 N.E.2d 309 (Ill. 2009) .........................................................................10

iii

*Goodman v. Kennedy*, 18 Cal. 3d 335 (1976) ..................................................................7

*Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2 (Minn. 2001) ................................10

*Hauter v. Zogarts*, 14 Cal. 3d 104 (1975) ...................................................................12

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) ...........................................................2

*Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19 (2007) ...........................................12

*Lambert v. Gen. Motors*, 67 Cal. App. 4th 1179 (1998) ...................................................14

*Mars, Inc. v. Heritage Builders of Effingham, Inc.*, 763 N.E.2d 428 (Ill. App. Ct. 2002) .........14

*Pearson v. Philip Morris Inc.*, 361 P.3d 3, 27-28 (Or. 2015) .............................................10

**STATUTES**

Cal. Bus. & Prof. Code § 17500, *et seq.*, California False Advertising Law ...............................2

Cal. Civ. Code § 1790, *et seq.*, California Song-Beverly Consumer Warranty Act .............13, 14

Or. Rev. Stat. Ann. § 646.605, *et. seq.*, Oregon Unlawful Trade Practices Act ("UTPA").........15

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b)..............................................................................................2, 4

Fed. R. Civ. P. 12(b)(6)........................................................................................1, 11

1

**INTRODUCTION**

2

    The allegations in this case are materially indistinguishable from those in three prior cases

3

concerning the same class of security vulnerabilities.  All three cases were dismissed with prejudice

4

on Rule 12(b) motions in opinions affirmed on *de novo* review by the Ninth Circuit.  The Court

5

should dismiss the Complaint here based on the same reasoning.

6

    Plaintiffs employ various tactics in an effort to avoid that outcome.  One tactic is the

7

invention in their Opposition of implausible allegations not found in their Complaint, such as that

8

the alleged defect causes Intel CPUs to "malfunction" and cease "operat[ing] as 'the brains'" of

9

computing devices.  Opp. to Mot. Dismiss (ECF No. 42, "Opp.") at 1, 10.  What the Complaint

10

actually alleges, just as in the prior cases, is that the patch implemented to address this newest

11

vulnerability variant ("Downfall") slows down the processor.  *See, e.g.*, Complaint (ECF No. 1)

12

¶¶ 1-2.  Another tactic is to conflate the alleged "defect"—a design decision made years ago that

13

allegedly failed to anticipate the later discovery of a theoretical vulnerability—with the patch for

14

that vulnerability.  The patch is not a "defect."  Plaintiffs concede that the patch for Downfall does

15

what it is supposed to do, which is prevent cyberattacks that could exploit the vulnerability.  *E.g.*,

16

*id.* ¶¶ 1-2, 184.  Moreover, the patch did not exist, and thus could not have been disclosed, when

17

Plaintiffs bought their devices.  Yet a third tactic Plaintiffs employ is mischaracterizing (or ignoring)

18

allegations and decisions in the prior cases to avoid confronting how the results in those cases are

19

dispositive here.

20

    None of these tactics succeed.  This case is on all fours with the prior cases, and the result

21

should be the same.  Indeed, the Complaint devotes far more attention to Spectre and Meltdown

22

than to Downfall, the supposed focus of this case.  Just like the prior cases, Plaintiffs allege that a

23

performance-enhancing technology developed years ago (speculative execution) now turns out to

24

be a "design defect" because of subsequent discoveries by third-party security researchers of a new,

25

theoretical vulnerability variant.  *E.g.*, Compl. ¶¶ 5, 9, 12-13, 20, 155; Mot. Dismiss (ECF No. 30,

26

"MTD") at 4-5, 10-11.  As in those prior cases, Plaintiffs allege an omission on Intel's part in failing

27

to disclose the supposed "defect," yet Plaintiffs rely on *public* sources predating their purchases to

28

1   attribute knowledge of that "defect" to Intel.  Compl. ¶¶ 21-41, 135-51, 155; MTD at 7, 11-12.[1]  And

2   as in the prior cases, Plaintiffs allege that Intel CPUs are unmerchantable, even as the CPUs continue

3   to perform their core functions and millions of people, including Plaintiffs, continue to buy and use

4   them.  *E.g.*, Compl. ¶¶ 21-41, 282; MTD at 21.  The reasoning of the prior dismissals and Ninth

5   Circuit affirmances apply equally here.  The Court should dismiss the Complaint in full.

6   **I.    ALL OF THE FRAUD-BASED CLAIMS FAIL (Counts 1-4, 10-11, 14, 17-18).**

7       **A.    The Complaint Does Not Allege Any Affirmative Misrepresentation.**

8       Plaintiffs concede that the Complaint identifies no false or misleading affirmative

9   representation by Intel on which they relied, Opp. at 12, which requires dismissal of all

10  misrepresentation-based claims.  Although Plaintiffs assert that Intel was "simply wrong" in stating

11  that the False Advertising Law ("FAL") "requires an affirmative misrepresentation," *id.*, the FAL

12  expressly targets "statement[s]" that are "untrue or misleading."  Cal. Bus. & Prof. Code § 17500;

13  *see also McCoy v. Nestle USA, Inc.*, 173 F. Supp. 3d 954, 970 (N.D. Cal. 2016) (FAL claim requires

14  an "affirmative misrepresentation"), *aff'd*, 730 F. App'x 462 (9th Cir. 2018).  Plaintiffs' own

15  recitation of the standard makes the point clear:  The FAL requires "*an affirmative statement*."  Opp.

16  at 12 (quotation marks omitted).  Plaintiffs do not dispute that they allege no such statement here.

17      **B.    The Complaint Does Not Allege Any Actionable Omission.**

18      The crux of Plaintiffs' case is Intel's alleged omission.  All claims based on that theory fail.[2]

19          **1.    Plaintiffs Do Not Plead a "Defect."**

20      Plaintiffs' Opposition conflates the alleged "defect"—design decisions made many years

21  ago, *e.g.*, Compl. ¶¶ 5-7—with the mitigation put in place to address a new vulnerability variant

---

22  [1] All emphasis is added unless otherwise indicated.

23  [2] Plaintiffs wrongly contend that their UCL fraud-prong claims can proceed even if their
    common-law fraud counts are dismissed.  Opp. at 11-12.  Intel's arguments apply equally to UCL

24  fraud-prong claims.  *See, e.g.*, *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (Rule
    9(b) applies to fraud-based UCL and CLRA claims as well); *O'Shea v. Epson Am., Inc.*, 2011 WL

25  3299936, at *6, *11 (C.D. Cal. July 29, 2011) (duty to disclose required for omission claims under
    UCL, CLRA, FAL, and common law), *aff'd in part*, 566 F. App'x 605 (9th Cir. 2014); *Wilson v.*

26  *Hewlett-Packard Co.*, 668 F.3d 1136, 1145-46 (9th Cir. 2012) (pre-purchase knowledge of the
    defect required for omission claims under UCL, CLRA, and common-law fraud); *In re Tobacco II*

27  *Cases*, 46 Cal. 4th 298, 326 (2009) (there is "an actual reliance requirement on plaintiffs prosecuting
    a private enforcement action under the UCL's fraud prong").  Because Plaintiffs' fraud-based claims

28  are all based on the same alleged facts, they all fall together, as in the prior litigation.

1    discovered in 2022. The Complaint makes clear that the alleged CPU slowdowns at issue result

2    from *the mitigation*, not the CPU design. *E.g.*, *id.* ¶¶ 1-2, 27, 184, 194-95. The mitigation is not

3    the alleged defect,[3] and it was not implemented until after the discovery of the Downfall variant,

4    well *after* all named Plaintiffs purchased their devices. Plaintiffs expressly concede that at the time

5    of their purchases, their CPUs were "experienced as saleable" and "performed at merchantable

6    levels." Opp. at 21-22. Thus, the only "defect" at that time, and therefore the only information Intel

7    could have omitted at that time, was that Intel processors incorporated speculative execution design

8    features without anticipating they might give rise to security vulnerabilities discovered in the future.

9          As to *that* alleged "defect," the Ninth Circuit's reasoning in the related case against AMD is

10   dispositive. It is not sufficient to allege that CPUs "are vulnerable to side-channel attacks generally"

11   or are vulnerable generally "because of . . . some other subset of their features." *Hauck v. Advanced*

12   *Micro Devices, Inc.* ("*AMD III*"), 816 F. App'x 39, 42 (9th Cir. 2020). Plaintiffs' approach here—

13   pointing to an earlier implementation of a "subset of features" and retrospectively labelling those

14   features "defective" because years later a researcher discovered a new theoretical vulnerability—

15   fares no better than it did in *AMD*.[4]

16          Plaintiffs assert that that they have alleged a defect that is different from the alleged defect

17   in the prior litigation, but their factual recitation belies that contention. They describe the "defect"

18   as "leav[ing] 'side effects' . . . in temporary buffers or in the CPU's cache memory" as a result of

19   speculative execution. Opp. at 3. *That is the same "defect" alleged in the prior litigation*. *See*

20   MTD at 5 & Ex. 4 ¶¶ 4-6. Plaintiffs allege that Intel CPUs are defective because they continue to

21   incorporate "the design flaw that gave rise to Spectre and Meltdown," Opp. at 4, that they exhibit

22   "continuing vulnerability to the same category of attacks as Spectre and Meltdown," *id.*, and that

---

[3] *See In re Apple Processor Litig.* ("*Apple II*"), 2022 WL 2064975, at *9 (N.D. Cal. June 8, 2022) (Spectre and Meltdown patches do not "constitute physical defects giving rise to a duty to disclose" and "may not even be properly considered a 'defect' in the first instance" (citation omitted)).

[4] Plaintiffs devote nearly a full page of their brief to a convoluted hypothetical about exploding cars. Opp. at 2-3. This counterfactual and absurd analogy to the present context—where there is no physical safety hazard, *see infra* p. 5; where Intel CPUs were *concededly* merchantable at the time of purchase, *see infra* p. 11, and continue to perform their central function of processing data; and where materially indistinguishable allegations were considered and dismissed by three different federal courts—only spotlights Plaintiffs' inability to overcome those prior dispositive holdings.

Intel allegedly failed to "eliminate the speculative execution defects it was alerted to from the Spectre/Meltdown defect," *id.* at 10. That this case involves "AVX buffers" while Spectre and Meltdown involved "cache memory" is a distinction without a difference. The AVX buffers are not the "defect"; buffers and caches are simply various locations in which CPUs temporarily store information (and thus can be targeted by different variants of this same class of attacks). *See* Compl. ¶¶ 5-7, 85 (describing the defect as Intel's design of speculative execution which does not "discard[] the results of an execution if the CPU guessed wrong" but instead "leaves 'side effects'" in memory—in "registers, *cache, buffers*, or other memory locations").

Even if the "defect" alleged here were different from the defect alleged in the prior cases because of allegations here specific to AVX instructions, Plaintiffs' allegations still would not satisfy even the *Twombly* plausibility standard, let alone Rule 9(b). As in the prior litigation, the use of speculative execution for AVX instructions is just another "subset of [CPU] features" that Plaintiffs, with the benefit of hindsight, call "defective" because years later a researcher discovered a new theoretical vulnerability. *E.g.*, Compl. ¶¶ 5, 9, 12-13, 20, 155; MTD at 4-5, 10-11. For the reasons stated by the Ninth Circuit in *AMD*, that is not a viable claim. Consumers understand that their computing devices will not be "completely impervious to novel cybersecurity threats," and "the harm represented by [a] theoretical risk of a cybersecurity flaw that has not yet been successfully exploited" does not "outweigh[] the other benefits of [the manufacturer]'s processor design." *AMD III*, 816 F. App'x at 43.

> **2.    The Omission Claims Fail Because Either the "Defect" Was Publicly Known, or Intel Did Not Know of It.**

Plaintiffs' omission claims would fail even if Plaintiffs had pleaded a cognizable defect. The alleged design "defect" that led to Spectre and Meltdown—which was not a defect at all, as the prior cases determined—has been publicly known since at least early 2018. There could be no omission claim here based on that alleged "defect" because the earliest alleged purchase by any Plaintiff was in January 2020. Compl. ¶ 33. The result is the same even if the "defect" is characterized to include design decisions specific to AVX. Plaintiffs contend that Intel learned of alleged AVX issues in mid-2018 from two researchers who reported that AVX instructions could be vulnerable to certain

4

1   other attacks (not Downfall).  Opp. at 1, 3-4, 6-7.  But the Complaint acknowledges that these

2   AVX-related research findings *were public* before Plaintiffs purchased their devices.  Compl.

3   ¶¶ 21-41, 136-39, 145-46.  Thus, there could not have been any omission at the relevant time.

4         Plaintiffs' response is that notwithstanding the 2018 publication of AVX research, "the

5   Downfall exploit, *and its related defect*, were *not discovered until 2022*."  Opp. at 6-7; *see* Compl.

6   ¶ 155 (alleging that Downfall was first "reported . . . to Intel on August 24, 2022").  Plaintiffs

7   thereby concede that at the time of Plaintiffs' purchases, Intel had no knowledge of the "defect,"

8   and thus could not be liable for an omission.  *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136,

9   1145-48 & n.5 (9th Cir. 2012) ("Plaintiffs must allege [the manufacturer's] knowledge of a defect

10  to succeed on their claims of deceptive practices and fraud.").  This inconsistency in Plaintiffs'

11  position mirrors the situation in the prior litigation, and their omission claims fail for the same

12  reason: either the "defect" was publicly known at the relevant time, or there is no well-pleaded

13  allegation that Intel knew of it.  *See In re Intel Corp. CPU Mktg., Sales Pracs. & Prods. Liab. Litig.*

14  ("*Intel III*"), 582 F. Supp. 3d 771, 785 (D. Or. 2022) ("[I]f the technical materials do not show public

15  disclosure of the Unauthorized Access defect, then they also do not show Intel's knowledge of the

16  Unauthorized Access defect.").  Either way, the claims fail.

17         **3.    Plaintiffs Do Not Allege Any Duty To Disclose.**

18             **a.  Plaintiffs plead no safety hazard.**

19         Plaintiffs do not and cannot allege any safety hazard, and therefore their omission claims fail

20  under *Wilson*, 668 F.3d at 1142.  Plaintiffs do not address this pleading requirement at all.  *See* MTD

21  at 13; Opp. *passim.*[5]

22             **b.  Plaintiffs plead no central functional defect.**

23         Even if *Wilson*'s safety-hazard requirement did not apply, the omission claims would still

24  fail because the Complaint does not plead a central functional defect in Intel CPUs any more than

25  the materially identical allegations did in the prior litigation.  *See In re Intel Corp. CPU Mktg., Sales*

26  *Pracs. & Prods. Liab. Litig.* ("*Intel V*"), 2023 WL 7211394, at *1 (9th Cir. Nov. 2, 2023) (citing

---

[5] *See, e.g.*, *Bradford v. L.A. Cnty. Off. of Educ.*, 2020 WL 6154284, at *2 n.1 (C.D. Cal. Aug. 19, 2020) ("[A]rguments to which no response is supplied are deemed conceded.").

1    *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 864 (9th Cir. 2018)).  Plaintiffs attempt to evade this pleading

2    failure through facially implausible assertions in their Opposition without support in the Complaint.

3            At the threshold, Plaintiffs do not contend that at the time of their purchases, the mere

4    theoretical susceptibility of their Intel CPUs to the as-yet-undiscovered Downfall vulnerability

5    constituted a central functional defect.  They could not so contend, because the Complaint admits

6    that speculative execution and AVX instructions *enhance* performance.  *See* Compl. ¶¶ 5, 130-33.

7    That should be the end of the matter, because these design features (which were only later discovered

8    to be susceptible to Downfall) represent the only possible omission at the time of Plaintiffs'

9    purchases.  Since there was no negative effect of any kind *on the CPUs' function* at the time of

10   purchase, the theoretical susceptibility of those CPUs to a vulnerability variant that would be

11   discovered years later clearly was not a central functional defect that could trigger a duty to disclose.

12   *See In re Intel Corp. CPU Mktg, Sales Pracs. & Prods. Liab. Litig.* ("*Intel II*"), 2021 WL 1198299,

13   at *7-8 (D. Or. Mar. 29, 2021).

14           Plaintiffs try to confuse the issue by focusing on the performance impact of *the mitigation*

15   for Downfall.  Opp. at 8-10.  But that mitigation is not the alleged defect, and in any event, that

16   mitigation did not exist until "late 2023," Compl. ¶ 184, well after all of Plaintiffs' purchases, *id.*

17   ¶¶ 21-41.  Moreover, the Complaint alleges only that the mitigation "slows CPU performance by as

18   much as 50%."  *Id.* ¶ 1; *see also id.* ¶¶ 184, 194-95, 222.  As the Opposition acknowledges, the

19   Ninth Circuit has characterized a central functional defect as one that "renders [the] products

20   incapable of use by any consumer."  Opp. at 8 (quoting *Hodsdon*, 891 F.3d at 864).[6]  The alleged

21   performance impact does not meet that standard.  The plaintiffs in the prior cases alleged materially

22   the same performance impacts.[7]  The district court in *Intel MDL* found no central functional defect,

23

24   ─────────────────
     [6] Plaintiffs argue that "Intel's suggestion that Plaintiffs must stop using their computers to meet the
25   central functionality test is without any legal support," Opp. at 10, but that contradicts their own
     citation of *Hodsdon* for the "incapable of use" standard.  In any event, Plaintiffs fail to meet even
26   the less stringent test for a central functional defect that the district court applied (without deciding
     the question) in *Intel MDL*.  *See Intel II*, 2021 WL 1198299, at *7-8.

27   [7] *See, e.g.*, MTD Ex. 8 (Second Am. Compl. ("SAC"), *Intel MDL*) ¶ 801 (alleging performance
     degradation "up to 54.5%"); MTD Ex. 4 (*Intel* SAC) ¶ 711 ("as much as 40 percent"); MTD Ex. 6
28   (*AMD* SAC) ¶ 171 (alleging "up to 50%" performance reduction).  Other excerpts of this pleading
     were attached as Exhibit 4 to Intel's motion to dismiss.  Intel respectfully requests that the Court

1    a decision that was affirmed on *de novo* review by the Ninth Circuit.  *Intel V*, 2023 WL 7211394, at

2    *1; *see also Hauck v. Advanced Micro Devices, Inc.* ("*AMD II*"), 2019 WL 1493356, at *17 (N.D.

3    Cal. Apr. 4, 2019) (despite alleged "performance slowdowns," processors were not "unusable").

4         In an effort to sustain their claim, Plaintiffs make assertions about the mitigation in their

5    Opposition that go beyond the Complaint and are plainly implausible.  Plaintiffs now say that

6    patched Intel CPUs "malfunction" and "do not operate as the 'brains' of the computing device,"

7    Opp. at 1, 10, but the Complaint does not allege anything of the sort.  Nor could it, as millions of

8    consumers—including Plaintiffs—continue to use devices containing Intel CPUs.  Compl. ¶¶ 4, 23,

9    31, 33, 35, 40, 282.  That would not be possible if their computers had no operating "brain."

10                          c.  **Plaintiffs allege no *LiMandri* factor.**

11        Plaintiffs' Opposition contends that Intel had exclusive knowledge of, and concealed, the

12   design "defect" (*LiMandri* prongs two and three).  Opp. at 10-11.  But the Complaint contains no

13   allegations that Intel had exclusive knowledge of any defect at the relevant time.[8]  *Supra* pp. 4-5.

14   Plaintiffs say Intel kept "the AVX buffers and other CPU components secret."  Opp. at 10.  But

15   AVX buffers are not a defect, even under Plaintiffs' theory.  They are merely a location where

16   information may be stored during speculative execution of AVX instructions.  *See* Compl. ¶ 91

17   ("buffers [are] where transient code may store information").  The "defect" Plaintiffs allege is that

18   Intel designed speculative execution in a way that allows information to remain in locations—

19   including but not limited to AVX buffers, *see id.* ¶ 85 (describing the alleged problem as "creat[ing]

20   'side effects'" in "registers, cache, buffers, or other memory locations"), ¶ 93 (blaming "branch

21   prediction, speculative execution, and out-of-order execution systems")—such that it could

22   theoretically be accessed by a side-channel attack.  The existence of buffers generally, or a particular

23   type of buffer as one more type of data storage location, is not the issue.  As to the "secret" nature

24   _____

25   take judicial notice of these additional allegations for the same reasons as in Intel's Request for
     Judicial Notice addressing the same pleading.  ECF No. 31.

26   [8] Plaintiffs' contention that only "superior knowledge" is required, Opp. at 8, is inconsistent with
     governing California Supreme Court precedent, as the Ninth Circuit also has observed.  *See*
27   *Goodman v. Kennedy*, 18 Cal. 3d 335, 347 (1976) (recognizing claim only where defendant has
     "sole knowledge" of information that was "inaccessible" to the plaintiff); *Hodsdon*, 891 F.3d at 864
28   n.5 (the "exclusive" position "appears to [be] the better reading of California law").

of the AVX buffers, the plaintiffs in the prior litigation also alleged that Intel failed to disclose various details of its CPU designs, but that did not prevent dismissal.[9]   In any event, the Complaint effectively concedes that the buffers were not a secret by alleging that "a Google engineer"—a third-party researcher unconnected to Intel—"discovered" them.  *Id.* ¶ 12; *see also id.* ¶ 155.

Plaintiffs also contend that Intel made misleading partial representations (*LiMandri* prong four), but those allegations fall short as well.  Plaintiffs point to a statement by Intel's former CEO that Intel had redesigned its CPUs to protect against "Variants 2 and 3," which were versions of Spectre and Meltdown.[10]  Opp. at 10 (citing Compl. ¶ 126).  Plaintiffs do not and cannot allege that this statement was false.  Further, that alleged statement was made in March 2018, *before* Intel allegedly learned of AVX-related issues (AVX Spectre and NetSpectre) in June and July 2018, let alone Downfall.  *See* Compl. ¶¶ 126, 135, 145.  Plaintiffs also cite media reports that Intel had patched its CPUs *against Spectre and Meltdown* and that Intel *separately* announced a new version of its AVX instructions.  Opp. at 10 (citing Compl. ¶¶ 127, 133-34).  Again, there is no plausible allegation of falsity.  The AVX-related findings by Yee and others already had been published by the time the latter statements were made in December 2018, Compl. ¶¶ 135-36, 145, and the discovery of Downfall was still almost four years in the future, *id.* ¶ 12, so there was nothing more to disclose.

### d.   Plaintiffs fail to allege any *material* omission.

Plaintiffs devote only a perfunctory paragraph to the materiality of the alleged omission.  Opp. at 8.  Although Plaintiffs allege in conclusory fashion that they would not have bought their

---

[9] *See, e.g.*, Ex. 8 (*Intel MDL* SAC) ¶ 10 ("Intel kept its hardware design strictly confidential, within its exclusive knowledge, and actively protected it as a trade secret."), ¶ 11 ("Intel concealed the Unauthorized Access Defect, never disclosing it publicly."), ¶ 16 ("Intel purposely implemented the Defects (and concealed them)"), ¶ 508 (Intel implemented defective design "in secret"), ¶ 554 (Intel kept vulnerabilities "secret from Plaintiffs"), ¶ 559 (Intel "secretly discarded" security protections), ¶ 911 ("Intel kept the Intel CPU Exploits secret").

[10] There are two variants of Spectre, *see* https://www.cisa.gov/news-events/alerts/2018/01/04/meltdown-and-spectre-side-channel-vulnerability-guidance (last visited Mar. 21, 2024); *see also* Compl. ¶ 127 (press accounts characterized Intel as having announced "fixes for both the Meltdown and Spectre v2 vulnerabilities").  Thus, the reference to "Variants 2 and 3" in early 2018 was addressing the second variant of Spectre (Variant 2) and Meltdown (Variant 3), two of the first three variants of the class in which Downfall is now more than the twentieth.  *See* MTD Ex. 4 (*Intel MDL* SAC) ¶ 709.

devices if they had known of the "defect," Compl. ¶¶ 24, 28, 32, 36, 41, the Complaint's allegations of public information undermine that assertion. The plaintiffs in the prior litigation also alleged that they would not have bought their devices if they had known of the alleged defect, but those allegations merited no deference when the allegedly omitted information was publicly known. The Ninth Circuit held in *AMD* that a plaintiff who allegedly overpaid for his AMD CPU *after* the public disclosure of Spectre had no claim because the alleged omission did not cause him to "act differently [than] he . . . otherwise would have acted." 816 F. App'x at 43 (citation omitted); *see also Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 971 (N.D. Cal. 2008) (materiality requires plausibly pleading that reasonable consumers would have acted differently had they known the omitted information), *aff'd*, 322 F. App'x 489 (9th Cir. 2009). The same logic applies here. Whether the "defect" is the design decision around speculative execution that made Spectre and Meltdown theoretically possible or a separate design decision around AVX instructions, the information at issue was public well before Plaintiffs purchased their devices.[11] That Plaintiffs nonetheless purchased Intel CPUs refutes the notion that the potential discovery of further variant vulnerabilities in this same class was material to their purchasing decision.[12]

### 4. Plaintiffs Do Not Plausibly Allege Reliance on Any Omission.

Plaintiffs correctly recite that to plead reliance on an omission under California law, they must plead a basis for believing that "had the omitted information been disclosed, [they] would have been aware of it and behaved differently." Opp. at 11 (quoting *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (citation omitted)). They identify no allegation in the Complaint that could satisfy that requirement. Plaintiffs cite their boilerplate allegations that they would not have

---

[11] Plaintiffs also acknowledge the numerous other variants in this class that have been disclosed since Spectre and Meltdown. *See, e.g.*, Compl. ¶¶ 109, 152; *see also* MTD Ex. 4 (*Intel MDL* SAC) ¶ 709 ("[S]ince the Meltdown and Spectre exploits were publicly disclosed in January 2018, almost two-dozen *new* exploit variations have been identified."). It is nonsensical to assert that a buyer of a device containing an Intel CPU after the fifth, or tenth, or fifteenth vulnerability variant has been disclosed and patched will find the prospect of further variants of the same nature material.

[12] For the same reason, Plaintiffs repeated references to their alleged "conjoint studies" of abstract consumer preferences, Opp. at 8-9, 11, 16-17, cannot save their claims when the allegedly concealed information was, by their own allegation, publicly known. *See AMD III*, 816 F. App'x at 43 (affirming dismissal given publicity around vulnerabilities and absence of plausible allegations "that consumers would have believed their devices were not susceptible to any cybersecurity threats").

1   purchased at the same price if they had known of the alleged defect, but the plaintiffs in *Apple* made

2   the same allegations and the court found that assertion "too conclusory" to save their complaint from

3   dismissal.  *See Apple II*, 2022 WL 2064975, at *10.  The same result is called for here.[13]

4   **II.    THE CLAIMS OF UNLAWFUL OR UNFAIR CONDUCT FAIL (Counts 2-3).**

5          Plaintiffs' claim of unlawful conduct under the UCL fails because all of the other claims on

6   which it is based fail.  *See Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1028 (N.D. Cal. 2012)

7   (Where "other claims fail, [the] UCL claims premised on 'unlawful' acts ha[ve] no basis and must

8   also fail." (citations omitted)).

9          Plaintiffs' unfair conduct claim also fails.  They insist that "Intel's decision to sell CPUs

10  without the necessary mitigations to make them safe against a known vulnerability was an unfair

11  practice" that is "distinct from Intel's fraudulent omission."  Opp. at 13.  The courts in the prior

12  litigation rejected the same tactic of attempting to revive a failed fraud claim by recharacterizing it

13  as "unfairness."  As the Ninth Circuit made clear, "[a]ny [unfairness] allegations that Intel sold its

14  processors while knowing them to be defective is simply another way of advancing Plaintiffs' fraud-

15  by-omission argument" and are "indistinguishable from the dismissed omission-based claims."

16  *Intel V*, 2023 WL 7211394, at *2.  That holding did not, as Plaintiffs argue, turn on mere pleading

17  failures to which they are not susceptible.  Opp. at 14; *see Intel V*, 2023 WL 7211394, at *2 (holding

18  that a failure to disclose when there is no duty to disclose "*cannot* have been 'substantially injurious'

19  for purposes of an unfair conduct claim" (quoting *Hodsdon*, 891 F.3d at 867)).

20         Plaintiffs attempt to distinguish *Intel MDL* on the ground that in the MDL, "Intel did not

21  know about the alleged defect and also did not know that the defect would result in crippling

---

22  [13] Plaintiffs assert that none of their alternative state subclass claims require reliance.  Opp. at

23  11.  But all of those state laws require causation.  In a case like this one involving allegations that
    plaintiffs have been misled, "reliance is what 'connects the dots' to provide the key causal link

24  between the misrepresentation and the loss."  *Pearson v. Philip Morris Inc.*, 361 P.3d 3, 27-28 (Or.
    2015) (Oregon law) (citation omitted); *see also DeBouse v. Bayer*, 922 N.E.2d 309, 316 (Ill. 2009)

25  (under Illinois law, no claim "[i]f there has been no communication with the plaintiff"); *Hills v.
    Arensdorf*, 543 F. Supp. 3d 1065, 1076 (D. Kan. 2021) (citing cases under Kansas law finding no

26  causal connection where plaintiff did not know of the alleged statement), *aff'd*, 2022 WL 3153657
    (10th Cir. Aug. 8, 2022); *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 14 (Minn.

27  2001) (en banc) ("conclud[ing] that causation is a necessary element" to recover damages in a
    Minnesota statutory misrepresentation action).  Therefore, Plaintiffs' failure to plead reliance on

28  any statement or omission by Intel is fatal under the laws of all these states.

1    mitigations." Opp. at 14. But that assertion defies the clear record of the MDL. The allegations in

2    *Intel MDL* were the same as the allegations here—that Intel knew of, and concealed, a "defect" in

3    its design, and that Intel knew of, and concealed, the anticipated impact of mitigating that "defect."

4    *See, e.g.*, Ex. 8 (*Intel MDL* SAC) ¶ 1 ("intentional concealment of specific design choices"), ¶ 11

5    ("concealed" the "Defect"), ¶ 16 ("purposely implemented the Defects (and concealed them)"), ¶ 26

6    ("deliberately concealed the known exploits that target undisclosed Defects in Intel CPUs and the

7    performance killing mitigations"), ¶ 29 ("concealed" that mitigations "would materially impact the

8    CPUs' performance"). Those allegations did not prevent dismissal there, and materially identical

9    allegations here should not either.[14]

10   **III.    THE IMPLIED WARRANTY CLAIMS FAIL (Counts 7, 8, 13, 16).**

11           As in the prior litigation, Plaintiffs fail to plausibly allege that Intel CPUs lack "even the

12   most basic degree of fitness for ordinary use." *AMD III*, 816 F. App'x at 44 (citation omitted).[15]

13   *Plaintiffs even expressly concede that these CPUs "performed at merchantable levels when initially*

14   *sold."* Opp. at 22; *see also id.* at 21 (CPUs were "initially experienced as saleable"). That should

15   end the discussion. But even if the mitigation for Downfall (which did not exist at the time Plaintiffs

16   purchased their devices) is considered, the result does not change. Plaintiffs allege that the

17   mitigation slowed performance by "as much as 50%," Compl. ¶ 1; *see also id.* ¶¶ 184, 194-95, 222,

18   but the courts in the prior litigation rejected implied-warranty claims on materially identical

19   allegations, ruling that CPUs "are certainly still operable" even if allegedly slowed down "up to

20   50%" by patches. *Hauck v. Advanced Micro Devices, Inc.* ("*AMD I*"), 2018 WL 5729234, at *9

21   (N.D. Cal. Oct. 29, 2018); MTD at 14-15 & Ex. 8 ¶ 801 ("up to 54.5%"); *see also In re Intel Corp.*

22   *CPU Mktg., Sales Pracs. & Prods. Liab. Litig.* ("*Intel I*"), 2020 WL 1495304, at *13 (D. Or. Mar.

23   27, 2020). The implied warranty of merchantability "does not impose a general requirement that

24   _____

25   [14] Plaintiffs do not argue that Intel's conduct was unfair in any way other than by repeating their
     failed omission allegations. Opp. at 12-14. Intel pointed out in its motion to dismiss that California
26   law does not recognize "unfair design choice" claims, *see* MTD at 19-20. Plaintiffs concede that
     point by failing to respond to it. *See Bradford*, 2020 WL 6154284, at *2 n.1.

27   [15] Plaintiffs' contention that Intel's arguments "invite a factual inquiry, not suitable for resolution
     on a motion to dismiss," Opp. at 17 n.3, is refuted by the prior decisions dismissing implied-warranty
28   claims on Rule 12 motions. *AMD III*, 816 F. App'x at 44; *Intel I*, 2020 WL 1495304, at *13.

1    goods precisely fulfill the expectation of the buyer." *Am. Suzuki Motor Corp. v. Super. Ct.*, 37 Cal.

2    App. 4th 1291, 1296 (1995) (internal quotation marks omitted).

3          To try to avoid these on-point decisions, Plaintiffs' Opposition once again grossly overstates

4    the allegations in their Complaint.  They assert that the alleged "defect" in Intel's design "renders

5    computers unable to properly process commands or run programs," Opp. at 17, but the Complaint

6    says no such thing.  The Complaint does not and cannot allege that the "defect" itself renders CPUs

7    unable to act as the "brains" of computers.  It alleges that the *mitigation* causes *diminished speed*.

8    *E.g.*, Compl. ¶¶ 1-2, 17, 23, 27, 31, 35, 40, 194-95.  That simply "does not support a claim for breach

9    of the implied warranty of merchantability."  *Intel I*, 2020 WL 1495304, at *13.

10         Plaintiffs also attempt to water down the governing legal standard.  The cases they cite (Opp.

11   at 16) show only that implied-warranty claims can proceed in a narrow class of cases involving

12   products that can carry out their basic functions only in grossly unsatisfactory ways that render them

13   effectively unusable.   For example, the *Intel MDL* court expressly distinguished *Isip v.*

14   *Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 26-27 (2007), because the alleged performance

15   issues with patched Intel CPUs are not "the equivalent of a car that smells, lurches, clanks or emits

16   smoke."  *Intel I*, 2020 WL 1495304, at *13.  *In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d

17   888, 925 (N.D. Cal. 2018), involved a phone that "experiences total failure" causing the user to

18   "permanently lose[] access to any data," and  *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1109

19   (N.D. Cal. 2015), involved manufacturer-installed software that "intercepts and/or transmits

20   personal communication data to third parties" without users' knowledge.[16]  There are no comparable

21   allegations here.

22   [16] The other cases Plaintiffs cite are similar.  *See In re My Ford Touch Consumer Litig.*, 46 F. Supp.
     3d 936, 959, 980-81 (N.D. Cal. 2014) ("obvious safety risks" allegedly caused by "crucial vehicle
23   function" failures, "including the defroster and the rearview camera" (citation omitted)); *Albrosco*
     *Ltd. v. Prince Agri Prods., Inc.*, 545 F. Supp. 3d 656, 660-64 (C.D. Ill. 2021) (premix vitamins fed
24   to herd allegedly caused severe health issues including stillbirths and genetic abnormalities);
     *Becerra v. Gen. Motors LLC*, 241 F. Supp. 3d 1094, 1114 (S.D. Cal. 2017) (truck headlights
25   allegedly posed serious safety hazard); *Corzine v. Whirlpool Corp.*, 2016 WL 6476172, at *1, *4
     (N.D. Cal. Nov. 2, 2016) (refrigerator-freezers allegedly leaked defrosted water); *Hauter v. Zogarts*,
26   14 Cal. 3d 104, 109, 118 (1975) (golf training device allegedly caused brain damage); *Lessin v. Ford*
     *Motor Co.*, 2020 WL 6544705 at *1, *7 (S.D. Cal. Nov. 6, 2020) (severely shaking steering wheel
27   allegedly "cause[d] a loss of handling and control"); *Day v. Advanced Micro Devices, Inc.*, 2023
     WL 6998188, at *1 (N.D. Cal. Oct. 23, 2023) (CPUs marketed specifically to gamers allegedly
28   stuttered "on an hourly basis" during gaming); *McLellan v. Fitbit, Inc.*, 2018 WL 2688781, at *4

                                                        12

1  Plaintiffs' California implied-warranty claim (Count 7) also fails for lack of vertical privity.

2  Plaintiffs cite a split of authority as to whether there is a third-party beneficiary exception to the

3  privity requirement. *See* Opp. at 18. This Court has ruled that there is no such exception. *See*

4  *Mandani v. Volkswagen Grp. of Am., Inc.*, 2019 WL 652867, at *6 (N.D. Cal. Feb. 15, 2019)

5  (Gilliam, J.). Plaintiffs offer no reason for the Court to reverse course. Plaintiffs cite *Elward v.*

6  *Electrolux Home Products, Inc.*, 214 F. Supp. 3d 701, 704-706 (N.D. Ill. 2016), for the existence of

7  a third-party beneficiary exception under Illinois law. Opp. at 19. "[C]ourts applying Illinois law

8  overwhelmingly refuse to follow *Elward*[]." *Cho v. Hyundai Motor Co.*, 636 F. Supp. 3d 1149,

9  1176 (C.D. Cal. 2022); *see also Johnson v. Nissan N. Am., Inc.*, 2018 WL 905850, at *5 (N.D. Cal.

10  Feb. 15, 2018) ("Illinois state courts are clear" that there is no third-party beneficiary exception in

11  claims for economic damages). Plaintiffs also invoke *Elward* for a purported exception from privity

12  under Illinois law where a plaintiff relied on the defendant's advertisements. Opp. at 19. There,

13  too, *Elward* repeatedly has been rejected. *See. e.g.*, *Redmon v. Whirlpool Corp.*, 2020 WL 9396529,

14  at *5 (N.D. Ill. Apr. 28, 2020) (rejecting that "relying on [a manufacturer's] written advertisements

15  and warranties" constitutes "direct dealings" between a manufacturer and consumer; citing

16  numerous supporting cases (citations omitted)). Even if that exception exists, despite having never

17  been recognized by the Illinois Supreme Court, it does not apply here because Plaintiffs do not allege

18  reliance on any Intel advertisement.

19  Plaintiffs' claim under the Song-Beverly Act (Count 8) also fails because the Complaint

20  does not sufficiently allege a California transaction. This claim is advanced only by Plaintiffs

21  Cameron and Waltrip, neither of whom is a California resident, and who allege that they "purchased

22  their Affected CPUs from Intel through Microcenter and NewEgg.com." Compl. ¶¶ 25, 29, 426,

23  430. It is not clear whether Cameron purchased from a retail store or online. Waltrip apparently

24  bought online, *id.* ¶ 25, but she does not allege the location from which her device was shipped.

25  Thus, the only basis for Plaintiffs' bare allegation that these transactions occurred in California is

26  

_____

27  (N.D. Cal. June 5, 2018) (heart monitoring device allegedly often "fail[ed] to record any heart rate at all or provide[d] highly inaccurate readings"); *Stearns v. Select Comfort Retail Corp.*, 2009 WL

28  1635931, at *8 (N.D. Cal. June 5, 2009) (allegedly moldy beds).

1    that "Intel is headquartered in California and directs its United States sales and shipping operations

2    from California."  Compl. ¶ 430; *see also* Opp. 20 n.9.  But "the manufacturer's place of business

3    is not relevant" for Song-Beverly purposes.  *In re Seagate Tech. LLC Litig.*, 2017 WL 3670779, at

4    *16 (N.D. Cal. Aug. 25, 2017).  These Plaintiffs purchased from Microcenter and NewEgg, not

5    Intel.  There is no allegation that Intel shipped anything to Cameron or Waltrip, or that Microcenter

6    or NewEgg is affiliated with Intel in any way.  Consumers who purchase from third-party retailers

7    such as these are not purchasing "from Intel."  *See Clemens v. DamlerChrysler Corp.*, 534 F.3d

8    1017, 1023 (9th Cir. 2008) ("an end consumer . . . who buys from a retailer is not in privity with a

9    manufacturer").  Plaintiffs therefore have not sufficiently alleged a California transaction.

10   **IV.    THE NEGLIGENCE CLAIM FAILS (Count 6).**

11          Plaintiffs do not dispute that under California law, the failure to allege a cognizable defect

12   refutes any claim of negligent design.  *See Lambert v. Gen. Motors*, 67 Cal. App. 4th 1179, 1186

13   (1998).  Plaintiffs failure to allege any defect is fatal to their negligence claim.

14          The economic loss doctrine also bars the negligence claim.  Attempting to invoke the

15   exception for harm to separate property, Plaintiffs point to their allegations of harm to their

16   computers.  On indistinguishable facts, however, the *AMD* court found that computers and the CPUs

17   inside them are not separate property.  Rather, CPUs and the computers in which they function are

18   "integrally tied," so it "makes no sense to analytically separate" one from the other for

19   economic-loss rule purposes.  *AMD I*, 2018 WL 5729234, at *11.  Plaintiffs do not even attempt to

20   address that decision (or *In re Sony Vaio Computer Notebook Trackpad Litig.*, 2010 WL 4262191

21   (S.D. Cal. Oct. 28, 2010)).  *See* MTD at 22-23.  Moreover, the Complaint attributes Plaintiffs'

22   alleged harms to *the mitigation* for Downfall, not the alleged "defect."  Compl. ¶¶ 243-48.[17]

---

23   [17] The mitigation allegation distinguishes this case from *In re NVIDIA GPU Litigation Cases*, 2009
24   WL 4020104, at *2 (N.D. Cal. Nov. 19, 2009) (plaintiffs alleged that "under normal use *the defect*
     causes the Class Computers to generate excessive heat, which forces the system fan to run more
25   often, increasing ambient noise and reducing battery life").  Plaintiffs also cite *In re Lenovo Adware
     Litigation*, 2016 WL 6277245, at *10 (N.D. Cal. Oct. 27, 2016), but the court there *dismissed* a
26   negligence claim on economic-loss grounds, and *Adirondack Combustion Technologies, Inc. v.
     Unicontrol, Inc.*, 793 N.Y.S.2d 576 (App. Div. 2005), cited by Opp. at 25, was not decided under
27   California law and has been criticized as inconsistent with New York law and Supreme Court
     precedent.  *See Trump Int'l Hotel & Tower v. Carrier Corp.*, 524 F. Supp. 2d 302, 310-11 (S.D.N.Y.
28   2007).  Other cases cited by Plaintiffs support Intel's argument.  For example, *Mars, Inc. v. Heritage
     Builders of Effingham, Inc.*, 763 N.E.2d 428 (Ill. App. Ct. 2002), rejected a claim on economic-loss

1

2

## V.   THE QUASI-CONTRACT AND UNJUST ENRICHMENT CLAIMS FAIL (Counts 5, 9, 12, 15, 19).

Because Plaintiffs have not pleaded a viable omission claim, as described above, they also have not pleaded viable quasi-contract/unjust enrichment claims.  Plaintiffs' arguments in support of those claims, Opp. at 20-23, rehash their unfair conduct arguments, which in turn rehash and depend on the viability of their omission arguments—i.e., that Intel has been unjustly enriched because it knew about, but omitted to disclose, a defect in its product.  These claims thus "depend upon the viability of the Plaintiffs' other claims." *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 989 (N.D. Cal. 2009).  Yet Plaintiffs' fraud claims fail for the reasons above.  "[W]ithout an actionable omission, Plaintiffs need to allege why Intel's retention of the benefit conferred is unjust," but they cannot do so.  *Intel II*, 2021 WL 1198299, at *11; *see also Oestreicher*, 544 F. Supp. 2d at 975 (where fraud claims were dismissed, "plaintiff has no basis for its unjust enrichment claim.").

## VI.   THE OREGON UTPA CLAIM FAILS FOR ADDITIONAL REASONS (Count 10).

Plaintiffs offer no response to Intel's argument that their Oregon Unlawful Trade Practices Act claim fails both (1) because Ms. Cordova purchased her computer for business rather than personal use and (2) because the statute covers only final consumer goods and not components like the Intel CPU inside Ms. Cordova's computer.  MTD at 25.  Plaintiffs' silence constitutes abandonment of that claim.  *See Bradford*, 2020 WL 6154284, at *2 n.1.

## VII.   COUNTS 11, 17, AND 18 ALSO FAIL BECAUSE THEY DO NOT PLEAD INTENT.

As Intel's motion pointed out, the Kansas and Minnesota consumer-fraud statutes (Counts 11, 17-18) require an intent to deceive, or an intent that consumers rely on the seller's silence, MTD at 25, neither of which are alleged in the Complaint.  The Opposition does not address this shortcoming, and the claims under Kansas and Minnesota law should also be dismissed.

### CONCLUSION

The Complaint should be dismissed in its entirety.

---

grounds because "the damaged property was part of an integrated system, such that the damaged property could not be separated from the 'product.'"  *Id.* at 438.  The same is true here.

15

1

Dated: March 22, 2024          By:   */s/* David S. Kurtzer-Ellenbogen

2                                           David S. Kurtzer-Ellenbogen

3

4 WILLIAMS & CONNOLLY LLP
David S. Kurtzer-Ellenbogen (*pro hac vice*)
dkurtzer@wc.com

5 680 Maine Avenue, S.W.
Washington, DC 20024

6 (202) 434-5000 / FAX (202) 434-5029

7 STOEL RIVES LLP
Charles H. Samel (SBN 182019)

8 charles.samel@stoel.com
Lauren V. Neuhaus (SBN 327698)

9 lauren.neuhaus@stoel.com
1 Montgomery Street, Suite 3230

10 San Francisco, CA 94104
(415) 617-8900 / FAX (415) 617-8907

11

12 *Attorneys for Defendant Intel Corporation*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT INTEL CORPORATION'S REPLY IN SUPPORT OF MOTION TO DISMISS
Civil Action No. 4:23-CV-05761-HSG