# EXHIBIT 8

**Steve D. Larson,** OSB No. 863540
Email: slarson@stollberne.com
**Jennifer S. Wagner,** OSB No. 024470
Email: jwagner@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, Oregon 97204
Telephone: (503) 227-1600

*Attorneys for Plaintiffs*

[Additional Counsel Listed on Signature Page.]

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| IN RE: INTEL CORP. CPU MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to ALL ACTIONS | Case No. 3:18-md-02828-SI<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

Plaintiffs, individually and on behalf of the members of the Class defined below, allege the following against Defendant Intel Corporation ("Intel" or "the Company"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, the investigation of counsel and review of public documents as to all other matters.[1]

## INTRODUCTION

1.     Despite Intel's intentional concealment of specific design choices that it long knew rendered its central processing units ("CPUs" or "processors") unsecure and defective, it was only in January 2018 that it was first revealed to the public that Intel's CPUs have significant security vulnerabilities that give unauthorized program instructions access to protected data.

2.     A CPU is the "brain" in every computer and mobile device and processes all of the essential applications, including the handling of confidential information such as passwords and encryption keys.  Maintaining the security of confidential information is a fundamental function of all CPUs that Plaintiffs and members of the Class relied upon Intel to provide.  "Processor-level security is foundational and can prevent the exploitation that software-based products can be prone to."[2]  Indeed, the CPU "plays a fundamental role in security because of performance, hardware-rooted trust, and the ability to provide security functionality, such as encryption, while exposing minimal attack surface area."[3]

---

[1] Plaintiffs do not re-plead in this Second Amended Consolidated Class Action Complaint those claims that the Court dismissed with prejudice in its March 27, 2020 and March 29, 2021 decisions (ECF Nos. 178, 204).  In accordance with Ninth Circuit precedent, re-pleading is unnecessary to preserve those claims for appeal.  *See Lacy v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012).

[2] *See* John Abbott, *Trusting in the CPU: Getting to the Roots of Security*, June 2017 at p. 4.

[3] *Id*. at p. 9

PAGE 1 –     SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT

Snoop-assisted L1 Data Sampling, and the yet-to-be-disclosed exploits are referred to collectively with Meltdown, Spectre, and Foreshadow as the "Intel CPU Exploits."

9.      The Defects that allow the Intel CPU Exploits are the direct result of Intel's knowing decision to sacrifice security in favor of speed to gain an edge in its ongoing competition with rivals such as Advanced Micro Devices, Inc. ("AMD").  As with the Meltdown and Foreshadow exploits, Fallout, RIDL, ZombieLoad, SwapGS, LazyFP, Vector Register Sampling, and CacheOut exploit Intel-processor Defects.   AMD has reported that its processors are not subject to Meltdown, Foreshadow, Fallout, RIDL, ZombieLoad, SwapGS, LazyFP, Vector Register Sampling, and CacheOut.  Despite Intel's efforts to mischaracterize the Defects and the Intel CPU Exploits as industry-wide risks of chip manufacturers, the truth is that only Intel designed its CPUs in this flawed manner and, because of its design choices, the Intel CPU Exploits are largely an Intel-only problem.

10.      Moreover, Intel's decision to forego security for the sake of speed was contrary to the public statements it made about the security of its processors.  Although Intel publicly touted its processors' security, Intel kept its hardware design strictly confidential, within its exclusive knowledge, and actively protected it as a trade secret.  Plaintiffs and members of the Class had no way of knowing before their purchases that Intel disregarded a fundamental CPU function – data security – and knowingly designed its CPUs to permit unprotected memory access during speculative execution.

11.      To be sure, Intel concealed the Unauthorized Access Defect, never disclosing it publicly.  This was non-public information that was unavailable to Plaintiffs or anyone else outside Intel.  Even after the disclosure of Meltdown and the other Intel CPU Exploits, Intel failed to disclose

PAGE 4 –      SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
               COMPLAINT

the Unauthorized Access Defect, *i.e.*, the root cause of the exploits. This defect – an intentional design decision by Intel to remove well-accepted security that had ensured memory isolation – was not written about or known to industry experts, academics, or the public at large. Plaintiffs are aware of no technical articles or white papers that discuss the Unauthorized Access Defect. As alleged herein, the Unauthorized Access Defect was concealed by Intel at all times.

12.     Intel inaccurately claims that there has been no successful use of the Intel CPU Exploits by any hacker. It is impossible to draw such a conclusion because executing the Intel CPU Exploits leaves no fingerprints or forensic trace and are thus exceptionally hard to detect. "But [it is] suspect[ed] that for intelligence agencies and commercial hacking groups, Meltdown and Spectre [as well as the other Intel CPU Exploits] are already parts of their toolkits; they're probably paired with fileless malware as an entry point. With fileless malware, nothing is written to disk, and with Meltdown [and the other Intel CPU Exploits], there's reportedly no need for privilege escalation. The result is a super-stealthy exploit that is less likely to trigger any alarms."[4]  Even Intel acknowledged that the Intel CPU Exploits could "be maliciously exploited in the wild by highly sophisticated cyber-criminals."[5]

13.     Although programs without the requisite permission should not be allowed to read data associated with other programs, an unauthorized user can exploit the Defects to get hold of secrets stored in the memory of other running programs. This might include confidential or personal

---

[4]  Mike Fong, *Five Mobile Security Predictions For 2020*, Forbes (Jan. 16, 2020), https://www.forbes.com/sites/forbestechcouncil/2020/01/16/five-mobile-security-predictions-for-2020/#56a5fb822cb6

[5]  Maxwell Cooter, *We've secured our CPU silicon, and ready to secure your business, says post-Meltdown Intel*, The Register (Sept. 12, 2019), https://www.theregister.co.uk/2019/09/12/securing_the_silicon/

PAGE 5 –     SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

information such as passwords stored in a password manager or web browser, personal photos, emails, instant messages and even business-critical documents. For example, by exploiting the Defects, a web page in one browser tab could read a user's online banking password from another browser tab. Or, on cloud servers, one virtual machine could snoop on the data in other virtual machines on the same system. This is not supposed to be possible.

14. Although it has yet to come forth with a full and candid description of all facts known only to it concerning the unprecedented security Defects, what Intel has already admitted is damning. According to Intel, "[t]hese side-channel leaks are particularly dangerous in environments running large numbers of virtualized servers on shared host servers in the cloud. It is problematic because it is possible for an unauthorized virtual machine to eavesdrop on a victim's VM."[6] Acknowledging that its customers are "security conscious," Intel has advised its customers to "deploy only machines with the latest generations of processors inside" – which Intel claims include the necessary security defenses "built in."[7]

15. Because of the significant security threat these Intel CPU Exploits pose, Intel and other industry participants and experts advise all users to immediately patch all devices capable of patching and, for those devices for which Intel did not release patches, Intel advises users to immediately retire them and replace them with new devices. The reason that Plaintiffs and Class members are still using devices with defective Intel CPUs is because they have downloaded the

---

[6] Maxwell Cooter, *We've secured our CPU silicon, and ready to secure your business, says post-Meltdown Intel*, The Register (Sept. 12, 2019), https://www.theregister.co.uk/2019/09/12/securing_the_silicon/

[7] Maxwell Cooter, *We've secured our CPU silicon, and ready to secure your business, says post-Meltdown Intel*, The Register (Sept. 12, 2019), https://www.theregister.co.uk/2019/09/12/securing_the_silicon/

PAGE 6 – SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

patches they have been told safeguard the devices from the disclosed Intel CPU Exploits. As alleged herein, however, Intel continues to deceive Plaintiffs, Class members, and the public because the mitigations do not address the Defects. In order to truly secure the CPUs, the Defects must be fixed at the CPU *hardware* level.

16. Unbeknownst to Plaintiffs and members of the Class, Intel has known for years that its proprietary CPU design (which permitted unauthorized memory access during speculative execution) could be exploited by side-channel exploits. Furthermore, Intel has been aware of various methods that would secure its CPUs; yet has failed to implement them. Indeed, research shows that Intel purposely implemented the Defects (and concealed them), which undermined the security of Intel CPUs simply to achieve a performance advantage over AMD and other competitors.

17. As the leader in the global CPU industry, Intel knows the critical importance of both performance and protecting consumers' sensitive data from unauthorized access. Intel also knows the multitude of harms that foreseeably flow to individual consumers when sensitive data is stolen by criminals, including, among other things, identify theft, fraud, credit and reputational harm, erroneous tax claims, and extortion. Indeed, Intel's success is largely based on the advertised speed and security of its CPUs.

18. While some mitigations with microcode updates, operating system-level fixes, and patches to applications like web browsers have become available to ostensibly eliminate the threat of the publicly disclosed Intel CPU Exploits, the mitigations materially affect the performance of Intel's CPUs for all users and also have been shown to be inadequate in curing the Defects. Each mitigation associated with a new exploit creates an additional layer of performance impact.

19.     Notably, Intel has misreported and understated the significant performance impacts the mitigations cause and even suggested "there has been no meaningful performance impact observed as a result of mitigations applied."[8]  In response to third-party testing showing that the performance degradation caused by the mitigations was far greater than Intel reported, Intel attempted to add new restrictions to its software license agreement to prevent users from publishing software benchmark or comparison test results.   Despite Intel's efforts to hide declining performance, testing using accepted testing equipment, protocols, and a wide variety of benchmarks conducted by engineering experts in performance evaluation, confirm that each security mitigation *individually* leads to significant performance degradations in Intel processors (on average as high as 17.6% for Meltdown-related mitigations, 8.8% for those related to Spectre, 4.2% for those related to Foreshadow, and 20.6% for those related to MDS).  Moreover, combining the individual security mitigations in the default mitigations leads to a *cumulative* effect.  As a result, overall performance degradations are even greater and as high as 31.4% for Linux operating systems, 7.5% for Mac operating systems, and 16.6% for Windows operating systems on account of the default mitigations on average.  For certain workloads, Intel's CPU mitigations degraded performance by 46.6% on average and up to 54.5%.

20.     Each Plaintiff and member of the Class suffered injury from Intel's security mitigations, one way or the other, *irrespective* of the following:

- Level of security mitigation:  individual or cumulative;

- Processor type:  desktop, mobile or server processor;

---

[8]   *Resources and Response to Side Channel L1 Terminal Fault*, Intel, https://www.intel.com/content/www/us/en/architecture-and-technology/l1tf.html

PAGE 8 –     SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT

- Operating system:  Linux, Mac OS, or Windows;

- Software:  system software, networking, application software, Web browsing;

- Price:  expensive versus cheaper processor;

- Time of purchase (release date):  new versus old processor; and

- CPU Model:  i9, i7, i5 or i3.

21.     Even worse, to minimize the risk of exploit, it is recommended that users disable key Intel CPU performance functionality altogether, such as Hyper-Threading (which allows a single physical CPU to appear as two logical CPUs to an operating system with the ability to share physical execution resources).[9]    That is why Google disabled Hyper-Threading on its Intel-based Chromebooks.

22.     In other words, every Plaintiff's CPU now suffers reduced functionality and performance as a direct result of downloading Intel's mitigations to address the undisclosed Defects in Intel's CPU design.   As a consequence of the material post-mitigation performance and functionality degradation, Plaintiffs' processors' performance is essentially downgraded into the performance of slower lower cost processors.

23.     The only true fix is to exchange each defective CPU for a device containing a processor not subject to the Defects.  The fact that Intel has left variants of MDS unpatched for more than 18 months is a byproduct of Intel's piecemeal and incomplete response to the Intel CPU Exploits.  Rather than prevent further exploits by correcting the root cause of the exploits (i.e., the Defects), Intel merely provides a superficial patch for each specific exploit as researchers

---

[9] Stephen Röttger, *Escaping the Chrome Sandbox with RIDL*, Google Project Zero (Feb. 15, 2020), https://googleprojectzero.blogspot.com/2020/02/escaping-chrome-sandbox-with-ridl.html.

PAGE 9 –     SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
COMPLAINT

demonstrate yet another variant of the Intel CPU Exploits.  As long as Intel continues to only respond with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep happening.  As industry experts stress, "[r]esearchers find these things without even trying very hard.  And it probably means that other adversaries will find them, too."[10]

24.    To be sure, given that Intel has dozens of CVEs[11] reflecting the status "RESERVED," it appears that numerous yet-to-be-disclosed Intel CPU Exploits are known to Intel and have been embargoed for 6 months or more (characteristic of Intel's practice of significantly delayed disclosure of Intel CPU Exploits).

25.    Intel's mitigations are mere band-aids.  The security Defects need to be fixed at the CPU *hardware* level.  As even Intel has acknowledged, "industry experts have long realised that software only solutions simply will not cut the mustard, since they can ultimately be compromised or bypassed in some way.  Instead, security needs to be rooted in hardware capabilities that cannot be altered or disabled by malicious code."[12]

26.    Even after Intel learned that the Intel CPU Exploits were taking advantage of its design Defects, Intel unreasonably delayed disclosing the side-channel exploits for months, thereby increasing exposure, risk, and injury to Plaintiffs and the other Class members.  Incredibly, during this time, not only did Intel continue to market and sell its defective CPUs at a substantial premium, touting the defective CPUs' superior speed and security, but Intel also launched new defective

---

[10] Andy Greenberg, *Intel is Patching the Patch for the Patch for Its 'ZombieLoad' Flaw*, Wired (Jan. 27, 2020), https://www.wired.com/story/intel-ZombieLoad-third-patch-speculative-execution/.

[11] "CVE" refers to Common Vulnerabilities and Exposures, a standardized, industry-endorsed list of security vulnerabilities.

[12] Dan Robinson, *Hardware-drive security in the hybrid cloud*, The Register (Nov. 16, 2017), https://www.theregister.co.uk/2017/11/16/hardwaredriven_security_in_the_hybrid_cloud/

PAGE 10 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

products to the market knowing they were vulnerable to Meltdown and Spectre. Because Intel processors' higher prices are linked directly to their touted performance and security claims, Intel deliberately concealed the known exploits that target undisclosed Defects in Intel CPUs and the performance killing mitigations that would transform Intel's purported high-end CPUs into lower-end CPUs – all to take advantage of Plaintiffs, Class members, and the consuming public for Intel's profit.

27.     Google Project Zero teams confidentially shared their findings on Meltdown and Spectre to Intel in mid-2017; well before Intel launched its 8th generation "Coffee Lake" processors. The exploits were kept under embargo, and Intel did its best to make sure the public did not find out. Meltdown and Spectre were made public only on January 3, 2018.

28.     By the time Intel launched the "Coffee Lake" processor family (September 25, 2017, with October 5 availability),[13] Intel was fully aware that the product it was releasing was vulnerable to Meltdown and Spectre.[14] Intel's engineers had sufficient time to understand the severity of the vulnerability because "Coffee Lake" is essentially the same micro-architecture as "Kaby Lake" and "Skylake."

29.     Worse still, Intel knew or should have known that the mitigations for Meltdown and Spectre would materially impact the CPUs' performance and function and yet concealed this

---

[13]     Wikipedia, 2017 *Coffee Lake*, last modified April 30, 2021, https://en.wikipedia.org/wiki/Coffee_Lake

[14]     Btarunr, *Intel Released 'Coffee Lake' Knowing it Was Vulnerable to Spectre and Meltdown*, Tech Power Up (January 5, 2018), https://www.techpowerup.com/240283/intel-released-coffee-lake-knowing-it-was-vulnerable-to-spectre-and-meltdown#:~:text=By%20the%20time%20Intel%20launched,more%20publicized%20of%20which%2C%20are%20%22

information from Plaintiffs and class members. Intel could have (and, indeed, should have) very easily put out a notice stating that pending security patches could impact performance and provide approximate ranges that the patches will slow down systems. Revealing this information would not put security of the larger community at risk. In other words, there was no reasonable basis to withhold this information from the public, while simultaneously pushing defective products to the Plaintiffs and Class members at a substantial premium that Intel knew the products did not genuinely deserve. But Intel put its short-term profit ahead of the interests of its customers.

30. During this delay and before any of the Intel CPU Exploits were made public (and patches made available), and while Intel continued to advertise, market, and sell its known defective CPUs at a significant premium, former Intel CEO Brian Krzanich exercised and sold off nearly 900,000 company shares and stock options (while investors and the SEC were unaware of the vulnerabilities) – raking in about $24 million. This was months after being informed of the significant security exploits taking advantage of its flagship CPUs but before Intel publicly disclosed the problem. The stock sale left Krzanich with just 250,000 shares of Intel stock – the minimum that he is required to own under his Intel employment agreement. By withholding the facts concerning the defective CPUs, Intel put its own interests ahead of the very consumers who placed their trust and confidence in Intel and benefitted itself to the detriment of Plaintiffs and Class members.

31. During this period since mid-2017, when Intel indisputably knew not only that the Defects plagued its CPUs but also that Meltdown and Spectre exploited those Defects, and also knew that it would be releasing necessary mitigations to safeguard its CPUs, which would cause a significant impact on performance, Intel continued to sell and distribute its processors at a

PAGE 12 –    SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
             COMPLAINT

substantial premium. It did so without repairing or disclosing either the Defects or the need to download software patches that would materially impact performance. In other words, Intel intentionally duped every purchaser of an Intel CPU since mid-2017, including a number of Plaintiffs and Class members.

32. Indeed, despite knowing that its defective CPUs were vulnerable to Meltdown and Spectre and that the mitigations would materially impact the performance and functionality of the CPUs, Intel continued advertising the superior speed and security of its CPUs and selling and distributing them at a substantial premium.

33. The processors that Intel sold and distributed were not of the quality represented and were not capable of the security and performance that it represented, and Intel knew it.

34. Since the 1990's, every computer or device sold with an Intel chip has displayed a sticker with the slogan "Intel Inside," to make consumers believe that they were buying a product with the best, fastest and most powerful processor. And with its marketing and advertising, Intel led consumers to believe that each new generation of processors it introduced was faster and higher performing that the previous one. In fact, at the point of sale, whether online or in a brick-and-mortar store, consumers are presented with the specific processer speed for the Intel CPU that is inside. Plaintiffs and Class members had no reason to suspect and could not have reasonably discovered that Intel had sacrificed security for speed, that the CPUs suffered from the Defects or that their computers and devices would suffer significant performance degradation as a result of implementing mitigations necessary to address the Defects to protect against the Intel CPU Exploits.

35. Had Plaintiffs known about the Defects in Intel's CPUs or that Intel's mitigations needed to address the Defects and protect against the Intel CPU Exploits would materially impact

PAGE 13 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

506.    Additionally, Core featured a redesigned memory and cache subsystems.  With "Smart Memory Access," Intel purported to improve the processor's performance by more effectively utilizing the current system of buffers and cores to hide latencies created by accessing main memory.  Intel also imbued each execution core with the ability to speculatively load data for instructions prior to execution.  With "Advanced Smart Cache," Intel created a large shared L2 cache accessible by both cores on a chip.

507.    Intel's renewed reliance on Dynamic Execution, including branch prediction, and efficient memory and cache access led to reports of increased performance in processors based on the Core architecture.  Core-based desktop and server processors boasted 40% and 80% increased performance, respectively, over similar processors based on Netburst.[41]  Furthermore, these performance increases came at decreased clock speeds – the 2.66 GHz Core Duo 2 achieved 40% greater performance over a 3.6 GHz Netburst-based Pentium D processor.[42]  With Core, Intel stabilized its market share[43] and won back the performance crown[44].

508.    Unbeknown to Plaintiffs and members of the Class, however, research revealed that, unlike Intel's P6 architecture, Intel's Core architecture permitted unauthorized access by programs to protected memory.   In other words, the Core architecture purposely implemented the Unauthorized Access Defect to allow instructions to access the read value (instead of returning a

---

[41] 2006 Intel Annual Meeting Slides.

[42]  Jack Dowek, *Inside Intel Core Microarchitecture*, Intel, https://www.hotchips.org/wp-content/uploads/hc_archives/hc18/3_Tues/HC18.S9/HC18.S9T4.pdf (last visited May 5, 2020).

[43] 2006 Intel Annual Meeting Slides.

[44] [44] Fedy Abi-Chahla, *Intel Core i7 (Nehalem): Architecture by AMD?,* Tom's Hardware (October 14, 2008), https://www.tomshardware.com/reviews/Intel-i7-nehalem-cpu,2041.html.

PAGE 176 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                    COMPLAINT

random number similar to Intel's P6 and AMD's CPUs).[45]  Intel accomplished this in secret in order achieve superior performance over AMD's processors.  Indeed, the Defects were consciously designed and implemented by Intel as undisclosed performance features.

### 8.    "Tick/Tock" and the Nehalem Architecture

509.    Beginning with Core, Intel made "[p]erformance . . . an integral part of production definition and success."  To that end, "Intel set[] very aggressive performance targets to deliver products with compelling performance to the end user."[46]  Intel also "employ[ed] significant time and effort to ensure that the processor performance me[t] expectations at every stage of the product development cycle from concept to silicon arrival to product launch.  All design decisions [we]re weighed against performance impact."

510.    With the introduction of Core in 2006, Intel announced "an ambitious plan to return to evolving its processor architectures at a rapid pace, as [it] had done in the mid-1990s" known as "Tick-Tock."[47]  Each "Tick" represented Intel's effort to optimize the current microarchitecture design for a new manufacturing process or, in other words, shrinking the processor to fit on a smaller piece of silicon.  The first "Tick" after Core was the Penryn microarchitecture, which optimized Core for the 45-nanometer (nm) manufacturing process.  Each "Tock" represented Intel's effort to

---

[45] *See* H. Wong, *The Microarchitecture Behind Meltdown*, Stuffedcow.net (May 18, 2018), http://blog.stuffedcow.net/2018/05/MELTDOWN-MICROARCHITECTURE/.

[46] *The Original 45-nm Intel Core 2 Processor Performance*, Intel Technology Journal, Volume 12, Issue                        3                        (October                        2008), https://www.intel.com/content/dam/www/public/us/en/documents/research/2008-vol12-iss-3-intel-technology-journal.pdf.

[47] Fedy Abi-Chahla, *Intel Core i7 (Nehalem): Architecture by AMD?,* Tom's Hardware (October 14, 2008), https://www.tomshardware.com/reviews/Intel-i7-nehalem-cpu,2041.html.

PAGE 177 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
            COMPLAINT

- Dell XPS Tower Special Edition: "Never slow down with our most powerful XPS ever. Powered by 8th Generation Intel Core processors."

552. Intel's intensive marketing efforts resulted in record profits. "Q4 marked an all-time record quarter in an all-time record year. [Intel m]et or exceeded all 2017 corporate and business unit revenue, spending, and profitability goals." Intel recorded revenue of $62.8 billion in 2017 and $17.1 billion in the 4Q alone.[79]

553. The processors that Intel sold and distributed, however, were not of the quality represented. Intel knew that the failure to maintain memory isolation in the design and implementation of speculative execution could be exploited through side-channel attacks. It also knew the patches would significantly impact the level of CPU performance that Plaintiffs and Class members bargained and paid money for.

554. Incredibly, Intel made a habit of launching new products that were vulnerable to Intel CPU Exploits and keeping those vulnerabilities secret from Plaintiffs, Class members, and the consuming public. For example, after researchers informed Intel in May 2019 of the MDS exploits, Intel kept the MDS under embargo for over 18 months. During this time, Intel launched certain 10th generation "Ice Lake" processors that were vulnerable to the MDS exploits and required microcode patches to mitigate against the exploit.[80] As detailed herein, like the patches for Meltdown and Spectre, the MDS mitigations cause substantial performance degradation.

---

[79]     Q4'17     Earnings     Presentation,     Intel, https://d1io3yog0oux5.cloudfront.net/_9e8578e05cb2822a3c0c8800a0811dba/intel/db/887/7654/earnings_presentation/Q4-Earnings-Deck-Final-corrected.pdf (last visited May 18, 2021).

[80] Daniel Moghimi, *Data Sampling on MDS-resistant 10th Generation Intel Core (Ice Lake)* (2020), https://moghimi.org/papers/techreport2020-IceLakeMDS.pdf.

PAGE 198 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

555.    There was no reasonable basis, however, for Intel to withhold critical information from the public, while simultaneously marketing and selling its defective products to the Plaintiffs and Class members at a substantial premium that Intel knew the products did not deserve.  Intel should have disclosed that there were pending security mitigations that could impact security and performance and provided approximate ranges that the mitigations could impact devices with Intel CPUs.  Revealing this information would have protected the computer security of the larger community and would have removed the information asymmetry that Intel was exploiting to sell defective CPUs.

**B.    Intel's Processors Are Defective**

      **1.    Security Vulnerabilities Created by Intel's Use of Speculative Execution and an Unsecured Cache Subsystem Lead to Confidentiality Security Breaches**

556.    Ensuring the "confidentiality" of secret, sensitive, or private information by preventing its disclosure to an unauthorized entity is one of the most basic security properties, and an obligation Intel and its competitors in the industry acknowledged and accepted when designing new CPUs to release in the market.

557.    Hardware plays a central role in security.  "Fundamental to almost any security question is the idea of a secret.  Whether a secret is cryptographic key, or merely a hidden certificate, a secure processor must be able to generate, protect, and share that secret with the outside world."[81]

558.    All CPUs found in laptops, desktops, and data center servers require security to be useful for normal, ordinary use.  This security protects the confidentiality of sensitive information

---

[81] G. Edward Suh, et al., *Design & Implementation of the AEGIS Single-Chip Secure Processor Using Physical Random Functions* (2005), p. 1, http://csg.csail.mit.edu/pubs/memos/Memo-483/Memo-483.pdf.

PAGE 199 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                  COMPLAINT

by controlling access to the information such that only authorized users can read or modify it.[82] Since 1985, Intel's microarchitecture designs, like its competitors, have relied upon protected mode and virtual memory to ensure that sensitive information is protected from unauthorized access.

559.    As Patterson and Hennessy explain in their undergraduate textbook *Computer Organization and Design*, processors are designed "to compile each program into its own *address space* – a separate range of memory locations accessible only to this program. Virtual memory implements the translation of a program's address space to physical addresses. This translation process enforces protection of a program's address space from other virtual machines."[83] Indeed, these most basic design mechanisms – which Intel secretly discarded – "ensur[e] that multiple processes sharing the processor, memory, or I/O devices cannot interfere, intentionally or unintentionally, with one another by reading or writing each other's data. These mechanisms also isolate the operating system from a user process."[84]

560.    To be able to share computing resources, processors must guarantee that different users would be "isolated" from each other, i.e., one user's actions or tasks would not ordinarily be visible to another user. All programs likewise expect and rely on this memory isolation.

561.    A "security attack" or exploit is a specific action that can cause a "security breach" or an event that violates a basic security property. It is characterized by a detailed description of the

---

[82] Ruby B. Lee, *Security Basics for Computer Architects* (2013).

[83] *Computer Organization and Design, RISV-V Edition*, by D. A. Patterson and J. L. Hennessy (2018), pg. 420,
http://staff.ustc.edu.cn/~llxx/cod/reference_books/Computer%20Organization%20and%20Design%20RISC-V%20edition.pdf.

[84] *Id*.

PAGE 200 –   SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                        COMPLAINT

under the Default Mitigations and up to 35.3%. For AMD, performance degrades by 6.3% on average under the Default Mitigations (Spectre). Web browsing on Intel processors suffer significantly more compared to the AMD processors (6.3% performance degradation).

**3.    Intel Server Processors:  Typical Server Workloads**

797.    Plaintiffs' examination of Intel server CPUs focused on a set of typical server workloads:

| Category | Benchmark |
|---|---|
| Key-value store | *Memcached – get* |
| PHP | *PHPBench* |
| Database | *PostgreSQL* |
| Java | *SPECjbb2015* |
| Web server | *NGINX* |
| Web server | *Apache* |
| Mail server | *PostMark* |

798.    This set of benchmarks complements those considered above.  These further analyses for server processors examine a broader set of performance-critical applications common to server use.

- ***Key-value store***:  Memcached is a widely used distributed in-memory key-value store.  It is a central piece of software infrastructure to allow online services to scale to a large number of servers.

- ***PHP***:  PHP is a popular general-purpose scripting language that is widely suited to web development.  PHPBench performs a large number of tests against the PHP interpreter.

- ***Database***:  PostgreSQL is a widely used open-source relational database.

- ***Java***:  SPECjbb2015 is SPEC's Java server benchmark.

PAGE 279 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                   COMPLAINT

- ***Web serving***: Two benchmarks are included for static Web serving: one is run against the NGINX Web server, the other one is run against Apache. NGINX carries out 2,000,000 requests with 500 concurrent requests. Apache carries out 1,000,000 requests with 100 concurrent requests.

- ***Mail server***: PostMark evaluates small-file accesses similar to the tasks endured by web and mail servers. The benchmark performs 25,000 transactions, with 500 simultaneous files having sizes ranging between 5KB and 512KB.

799. Plaintiffs observed significant and severe performance degradations on all Intel server processors for the benchmarks and mitigation levels.

- Memcached: 26.2% average degradation (up to 36.4%) under the Default Mitigations, and 30.6% average degradation (up to 50.2%) under the Maximum Mitigations.

- PHPBench: no degradation under the Default Mitigations, and 14.6% average degradation (up to 18.5%) under the Maximum Mitigations.

- PostgreSQL: 8.7% average degradation (up to 11.7%) under the Default Mitigations, and 46.8% (up to 54.5%) average degradation under the Maximum Mitigations.

- SPECjbb: 2.3% average degradation (up to 3.8%) under the Default Mitigations, and 27.7% average degradation (up to 31.9%) under the Maximum Mitigations.

- NGINX: 23.7% average degradation (up to 27.1%) under the Default Mitigations, and 25.2% average degradation (up to 28.2%) under the Maximum Mitigations.

- Apache: 22.7% average degradation (up to 29.4%) under the Default Mitigations, and 6.1% average degradation (up to 20.6%) under the Maximum Mitigations.

PAGE 280 – SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
          COMPLAINT

- PostMark: 19.7% average degradation (up to 22.2%) under the Default Mitigations and 21.6% average degradation (up to 24.7%) under the Maximum Mitigations.

800.  ***Database performance***:  Server processors are widely used to run database workloads and to serve as web servers in enterprises.  Popular open-source databases include Apache Cassandra (NoSQL database), Facebook RocksDB (key-value database), and PostgreSQL (relational database); Apache Siege is a popular http web server load tester.

801.  The performance degradations of the individual mitigations are as follows: for Spectre (2.5% on average, up to 4.7%), for Meltdown (3.3% on average, up to 5.9%), and for MDS (7.3% on average, up to 11.9%).  The Default Mitigations lead to an average performance degradation of 9.5% and up to 13.4%.  The biggest performance impact is observed when disabling Hyper-Threading.  The MDS mitigation plus disabling Hyper-Threading degrades performance by 38.3% on average and up to 43.9%.  The Maximum Mitigations degrade performance by 46.6% on average and up to 54.5%.

802.  ***Virtualization***:  Virtualization is frequently used in server machines to isolate processes and applications from different users sharing the same physical machine.  Plaintiffs evaluated the performance impact of the security mitigations under virtualization on two server processors, namely Intel Xeon Gold 6138 Skylake and Intel Xeon E3 1280 v5 Skylake; and ran the set of benchmarks under KVM (Kernel-based Virtual Machine), which is a full virtualization solution for Linux on x86 hardware.

803.  The security mitigations cause a significant performance impact under virtualization.  For these two server processors, a performance degradation of 8.9% and 10.1% was observed under

PAGE 281 –  SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION
                     COMPLAINT

and that the mitigations to address such exploits would materially impact the CPUs' performance and functionality. Intel appreciated that the truth would hurt its substantial market share and ultimately the Company's profits. Thereafter, Intel took a series of deliberate steps that were motivated by its goals of keeping its market share in the chip market and maintaining its inflated pricing based on the perception of superior security and performance.

911. Intel kept the Intel CPU Exploits secret for as long as possible and continued to sell and distribute CPUs at a premium price through the time of public disclosure although it knew that its CPUs had the Defects that would continue to be plagued by future exploits and performance impacts resulting from necessary mitigations. Intel even launched new product to the market that it knew not only had the Defects but were also vulnerable to known Intel CPU Exploits – all while concealing the Defects, the Intel CPU Exploits, and the required mitigations that would substantially degrade performance and functionality.

912. Intel launched a broad public relations campaign and issued statements falsely claiming that the Intel CPU Exploits were an industry-wide problem and not unique to Intel, in an effort to avoid decreased sales, despite its knowledge that only Intel implemented the Unauthorized Access Defect and removed fundamental CPU security.

913. When Meltdown and Spectre were disclosed to the public in January 2018, Intel pledged to put "security" first and issued statements promising that future chips would be redesigned at the silicon (or hardware) level to protect against the exploits and their variants, although even its new chip releases have been plagued by the Intel CPU Exploits and performance impacts because Intel has failed and refused to fix the root cause (i.e., the Defects) at the hardware level. Intel merely provides superficial patches for a specific exploit as researchers meanwhile demonstrate yet another

PAGE 316 – SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

variant of the Intel CPU Exploits.  Intel knows that as long as it continues to respond only with symptomatic fixes, additional exploits like the Intel CPU Exploits will keep happening.  The only true fix is to exchange each defective CPU for processor not subject to the security and performance Defects.

914.    When the Intel CPU Exploits were finally disclosed to the public, Intel misreported and understated the significant performance impacts the mitigations cause.  Intel then attempted to ban users who downloaded its security patches from publishing or providing benchmark testing results showing the true performance impacts.

915.    Intel even manipulated the process for disclosing security exploits.  Although disclosures of security vulnerabilities are generally embargoed, the typical period is 90 days.  Intel has manipulated the disclosure process and has refused to disclose security vulnerabilities for much longer periods despite knowing about them.  For example, Intel took 21 months to disclose the MDS exploits and kept the exploits secret from Plaintiffs, Class members, and the public – all while it continued to  sell and distribute its defective products (and even launch new defective CPUs to market) at a substantial premium based on the false perception of Intel CPUs' superior security and performance.  Intel could have very easily put out a notice about pending security patches that could impact performance and provide approximate ranges that the patches will slow down systems.  Revealing this information would not put security of the larger community at risk.  But Intel put its short-term profit ahead of the interests of its customers.

916.    Intel's defective CPUs and its unfair conduct have, among other things, caused the Plaintiffs and Class members to unfairly incur substantial time and/or costs to mitigate, replace if